State of Maryland v. Hayes Sample, No. 54, September Term, 2019

**MARYLAND RULE 5-901(a) AND (b)(4) – AUTHENTICATING SOCIAL MEDIA EVIDENCE THROUGH CIRCUMSTANTIAL EVIDENCE – "REASONABLE JUROR" TEST –** Court of Appeals held that trial court did not abuse its discretion in admitting Facebook-related evidence, as there was sufficient circumstantial evidence under Maryland Rule 5-901(b)(4) for reasonable juror to find that Facebook profiles belonged to defendant, Hayes Sample, and to defendant's alleged accomplice, Claude Mayo, and to find that defendant unfriended accomplice on Facebook day after attempted armed robbery, in which accomplice was fatally shot.

Court of Appeals reaffirmed holding in Sublet v. State, 442 Md. 632, 678, 113 A.3d 695, 722 (2015), and concluded that, to authenticate social media evidence, there must be proof from which reasonable juror could find that it is more likely than not that evidence is what proponent purports it to be. Court of Appeals concluded State was not required to eliminate all possibilities that were inconsistent with authenticity, or prove beyond any question that defendant was one who used Facebook profile to unfriend accomplice's Facebook profile.

Court of Appeals held that there was sufficient circumstantial evidence under Maryland Rule 5-901(b)(4) for trial court to conclude that reasonable juror could find that it was more likely than not that "SoLo Haze" Facebook profile belonged to Sample and that "claude.mayo.5" Facebook profile belonged to Mayo. Evidence indicating that SoLo Haze profile belonged to Sample and claude.mayo.5 profile belonged to Mayo supported conclusion that Sample used SoLo Haze profile to unfriend claude.mayo.5 profile. Court of Appeals determined that, moreover, additional evidence supporting conclusion that more likely than not Sample used SoLo Haze profile to unfriend claude.mayo.5 profile included temporal proximity of unfriending to attempted armed robbery, Sample had motive to distance himself from Mayo, and during seventeen-day period after attempted armed robbery, claude.mayo.5 Facebook profile was only profile that was unfriended from SoLo Haze Facebook profile. All of these circumstances were sufficient for trial court to allow Facebook-related evidence to be presented to jury.

Circuit Court for Baltimore County
Case No. 03-K-16-000108
Argued: March 9, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 54

September Term, 2019

_____

STATE OF MARYLAND

v.

HAYES SAMPLE

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by Watts, J.

_____

Filed: May 11, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

It is axiomatic that for a trial court to admit evidence, there must be sufficient indicia that the evidence is authentic—*i.e.*, that the evidence "is what its proponent claims." Md. R. 5-901(a). A party can sufficiently authenticate evidence through "[c]ircumstantial evidence, such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics, that the offered evidence is what it is claimed to be." Md. R. 5-901(b)(4).

On two prior occasions, this Court has addressed authenticating social media[1] evidence through circumstantial evidence under Maryland Rule 5-901(b)(4). In <u>Griffin v. State</u>, 419 Md. 343, 357, 19 A.3d 415, 423-24 (2011), this Court held that a trial court abused its discretion in admitting alleged printouts of the defendant's girlfriend's MySpace profile, as the same had not been sufficiently authenticated through circumstantial evidence under Maryland Rule 5-901(b)(4) as belonging to the girlfriend. In <u>Sublet v. State</u>, 442 Md. 632, 672-73, 675-77, 113 A.3d 695, 719, 720-22 (2015), in an opinion that

---

[1]"Social media" are "forms of electronic communication (such as websites for social networking and microblogging) through which users create online communities to share information, ideas, personal messages, and other content (such as videos)[.]" Social Media, Merriam-Webster, https://www.merriam-webster.com/dictionary/social%20media [https://perma.cc/P25R-66L2]. In turn, on a social networking website, "people create and maintain interpersonal relationships[.]" Social Network, Merriam-Webster, https://www.merriam-webster.com/dictionary/social%20network [https://perma.cc/WS6M-S25L]. On a microblogging website, people engage in "blogging [] with severe space or size constraints[,] typically by posting frequent brief messages about personal activities[.]" Microblogging, Merriam-Webster, https://www.merriam-webster.com/dictionary/microblogging [https://perma.cc/27ZZ-GMHX]. Facebook and MySpace are examples of social networking websites, while Twitter (on which postings are known as "tweets") is an example of a microblogging website. Benjamin Fryer, Esq., Moore & Van Allen, *The Board, The Boss and Facebook*, 25 No. 14 Westlaw Journal Employment 1, at *1 (Feb. 8, 2011).

consolidated three cases, this Court applied Maryland Rule 5-901(b)(4) and held that the trial courts did not abuse their discretion in admitting or excluding certain social media evidence. This Court concluded that, to admit social media evidence, a trial court "must determine that there is proof from which a reasonable juror could find that the evidence is what the proponent claims[.]" Id. at 678, 113 A.3d at 722.

This case requires us to apply Maryland Rule 5-901(b)(4) and the "reasonable juror" test to determine whether a trial court abused its discretion in allowing a detective to testify that, the day after a defendant and his accomplice allegedly participated in an attempted armed robbery—during which the defendant's accomplice was fatally shot—the defendant unfriended[2] his accomplice on Facebook.

In the Circuit Court for Baltimore County, the State, Petitioner, charged Hayes Sample, Respondent, with attempted robbery with a dangerous weapon and other crimes. At trial, the State offered evidence that Sample and his accomplice, Claude Mayo, using guns, attempted to rob a liquor store. The liquor store's owner had a gun too, and used it to shoot Mayo, who died a short distance outside the liquor store. Sample fled the scene.

While investigating the attempted armed robbery, a detective searched Facebook for a profile associated with the name Claude Mayo. Ultimately, the detective requested from Facebook, and received, "Facebook Business Records" regarding two Facebook profiles—

_____

[2]Both "unfriend" and "defriend" mean "to remove (someone) from a list of designated friends on a person's social networking website[.]" *Unfriend*, Merriam-Webster, https://www.merriam-webster.com/dictionary/unfriend [https://perma.cc/R6BM-EV7C]; *Defriend*, Merriam-Webster, https://www.merriam-webster.com/dictionary/defriend [https://perma.cc/9M5G-QFGZ].

"claude.mayo.5"[3] and "SoLo Haze"— as well as a "Certificate of Authenticity of Domestic Records of Regularly Conducted Activity[.]"  The Facebook Business Records regarding the SoLo Haze Facebook profile indicated that the e-mail address "mrsample2015@gmail.com" was registered to that profile.  The SoLo Haze Facebook profile identified Baltimore as the "current city," and listed Edmondson-Westside High School and Towson University as the user's "[c]onnections[.]"  The owner of the SoLo Haze Facebook profile was friends with the owner of a Facebook profile named "Skky DaLimit Lynn[.]"  Prior to trial, Sample's counsel advised the circuit court that a Skkyla Lynn would be called as a defense witness.

The Facebook Business Records regarding the claude.mayo.5 Facebook profile also listed Baltimore as the "current city," and listed Patterson High School as the user's "[c]onnection[.]"  The owner of the claude.mayo.5 Facebook profile was friends with the owner of a Facebook profile named "Shantell Richardson[.]"  Shantell Richardson is Mayo's mother's name.

Significantly, the Facebook Business Records regarding the SoLo Haze profile indicate that, the day after Sample and Mayo allegedly attempted to rob the liquor store and Mayo was fatally shot, the claude.mayo.5 profile was unfriended from the SoLo Haze profile.  During the seventeen-day period to which the Facebook Business Records pertained, the claude.mayo.5 profile was the only one, of 175 profiles with which the SoLo

---

[3]In the Facebook Business Records, the name associated with the Facebook service is Claude Mayo and the "vanity name" is identified as "claude.mayo.5[.]"  We will refer to this Facebook profile as the  "claude.mayo.5" Facebook profile.

Haze profile was friends, to have been unfriended.

In the circuit court, Sample filed a motion *in limine* and a memorandum in support thereof, contending that the State would not be able to sufficiently authenticate the Facebook Business Records. The circuit court denied the motion. At trial, over Sample's counsel's objection, the prosecutor elicited testimony from the detective concerning information from the Facebook Business Records, including the circumstance that the Facebook Business Records regarding the SoLo Haze Facebook profile showed that, the day after the attempted armed robbery, the claude.mayo.5 Facebook profile had been unfriended.

The jury found Sample guilty of attempted robbery with a dangerous weapon and other crimes. Sample appealed, and the Court of Special Appeals reversed the convictions and remanded the case for a new trial, reasoning that the circuit court abused its discretion in admitting the Facebook-related testimony. See Hayes Sample v. State, No. 1715, Sept. Term, 2017, 2019 WL 3451812, at *4-5 (Md. Ct. Spec. App. July 31, 2019). The State filed a petition for a writ of *certiorari*, which this Court granted. See State v. Sample, 466 Md. 310, 219 A.3d 526 (2019).

Before us, the State contends that there was sufficient circumstantial evidence for a reasonable juror to find that the SoLo Haze Facebook profile belonged to Sample, that the claude.mayo.5 Facebook profile belonged to Mayo, and that Sample used his profile to unfriend the claude.mayo.5 profile. According to the State, Sample had a motive to distance himself from Mayo immediately after the crime and did so before his status as a suspect in the attempted armed robbery became publicly known. Sample responds that,

despite there being evidence that he created the SoLo Haze Facebook profile, there was insufficient evidence that he was the person who used the profile to unfriend the claude.mayo.5 profile.

We hold that the circuit court did not abuse its discretion in admitting the Facebook-related evidence, as there was sufficient circumstantial evidence under Maryland Rule 5-901(b)(4) for a reasonable juror to find that the SoLo Haze Facebook profile belonged to Sample, that the claude.mayo.5 Facebook profile belonged to Mayo, and that Sample used the SoLo Haze profile to unfriend the claude.mayo.5 profile the day after the shooting. We conclude that the standard of proof for authenticating social media evidence is the preponderance of evidence standard, *i.e.*, there must be sufficient circumstantial evidence for a reasonable juror to find that it is more likely than not that the social media evidence is what it is purported to be. Here, the circumstantial evidence supporting the conclusion that the profiles belonged to Sample and Mayo consists of evidence that the SoLo Haze and claude.mayo.5 Facebook profiles listed Baltimore City as their current cities and the connections listed in the profiles included schools in Baltimore City and the Towson area. The profiles' lists of friends included people who were either a friend or relative of Sample and Mayo. Moreover, the SoLo Haze Facebook profile name consists of a homophone of Sample's first name "Hayes," the "mrsample2015@gmail.com" e-mail address registered for the SoLo Haze Facebook profile contains Sample's last name, and the SoLo Haze profile had been identified as a friend on the claude.mayo.5 profile. Without more, the evidence indicating that the SoLo Haze profile belonged to Sample and the claude.mayo.5 profile belonged to Mayo indicates that Sample used the SoLo Haze profile to unfriend the

claude.mayo.5 profile.

There are, moreover, additional circumstances surrounding the unfriending that establish that a reasonable juror could find more likely than not that Sample was the person who unfriended the claude.mayo.5 profile. Those circumstances include the temporal proximity of the attempted armed robbery to the unfriending, and that Sample had a motive to distance himself from Mayo. Indicative of a motive to distance himself from Mayo, while speaking with detectives, Sample did not acknowledge being friends with Mayo despite surveillance video that showed Sample and Mayo walking together approximately fourteen minutes before the crime occurred and cellular telephone records that showed that there was a call made by Sample to Mayo approximately an hour before the crime. And, importantly, during the seventeen-day period after the attempted armed robbery, of 175 Facebook profiles listed as friends on the SoLo Haze Facebook profile, the claude.mayo.5 profile was the only one that was unfriended.

## BACKGROUND

### Opposition to Facebook Evidence

On July 24, 2017, Sample raised his opposition to the Facebook evidence during a pretrial hearing. During the hearing, Sample's counsel advised that he had provided the circuit court with a copy of a letter in which he had informed the prosecutor that he planned to object to certain Facebook-related evidence based on foundation. Sample's counsel stated that the letter included requests that the prosecutor provide additional information about the Facebook-related evidence and call an employee of Facebook as a witness at trial. The circuit court and Sample's counsel discussed whether the request for the prosecutor to

call a Facebook employee as a witness at trial was timely. Sample's counsel contended that the Facebook-related evidence included irrelevant hearsay that was not covered by the business records certification that the prosecutor had provided. The circuit court denied Sample's counsel's request to require the State to call a Facebook witness at trial, finding that Sample's counsel's request was untimely, and not related to authenticating the Facebook-related evidence.

## Motion *in Limine*

On August 3, 2017, Sample filed a "Motion in Limine to Exclude Facebook Evidence[,]" a memorandum in support of the motion, and Exhibits A through C. (Some capitalization omitted). Exhibits A and B consist of numbered pages, all of which have the heading "Facebook Business Record[,]" and Exhibit C is a "Certificate of Authenticity of Domestic Records of Regularly Conducted Activity[.]" In the motion *in limine* and the memorandum in support thereof, Sample contended that the Facebook Business Records were inadmissible on multiple grounds. Among other things, Sample argued that the Certificate of Authenticity of Domestic Records of Regularly Conducted Activity did not sufficiently authenticate the Facebook Business Records because it did not establish who authored the Facebook Business Records' contents. In the memorandum, as to authentication, Sample contended that the State would be unable to authenticate the Facebook Business Records using any of the methods for authenticating social media evidence that this Court set forth in Sublet, 442 Md. at 663, 113 A.3d at 713.

### *Exhibit A – Facebook Business Records for the SoLo Haze Profile*

In Exhibit A, which pertains to the SoLo Haze profile, page 29 states in pertinent

part:

|  |  |  |
|---|---|---|
| **Target** | 100009404335910 | |
| **Generated** | 2015-12-17 19:40:24 UTC[4] | |
| **Date Range** | 2015-12-01 00:00:00 UTC to 2015-12-17 23:59:59 UTC | |

* * *

|  |  |  |
|---|---|---|
| **Name**[5] | **First** | SoLo |
| | **Middle** | |
| | **Last** | Haze |
| **Registered E[-]mail Addresses** | 100009404335910@facebook.com mrsample2015@gmail.com | |
| **Vanity Name** | | |

* * *

|  |  |
|---|---|
| **Current City** | Baltimore, Maryland (112438218775062) |

Page 36 of Exhibit A states in pertinent part:

|  |  |
|---|---|
| **Connections** | Zodiac Signs (1616634441885213) |

---

[4]"UTC" stands for "Coordinated Universal Time[,]" which is "the time scale [that is] maintained through the General Conference of Weights and Measures[.]" 15 U.S.C. § 261(b). At trial, Special Agent Mathew Wilde of the Federal Bureau of Investigation, an expert in the field of historical cellular record analysis, explained that certain businesses that "span[] multiple time zones[,]" such as Facebook and phone companies, use UTC as "a [] standard time." The Court of Special Appeals and other courts have observed that UTC is five hours ahead of Eastern Standard Time ("EST"), and four hours ahead of Eastern Daylight Time ("EDT"). See, e.g., Holt v. State, 236 Md. App. 604, 610 n.4, 182 A.3d 322, 325 n.4 (2018); Airplanes of Boca, Inc. v. U.S. ex rel. Fed. Aviation Admin., 254 F. Supp. 2d 1304, 1307 n.1 (S.D. Fla. 2003); Zinn v. United States, 835 F. Supp. 2d 1280, 1287 & n.3 (S.D. Fla. 2011). Pursuant to federal law, each year, on the second Sunday of March, EST ends and EDT begins, and, on the first Sunday of November, EDT ends and EST begins. See 15 U.S.C. § 260a(a).

[5]"Facebook prompts new users to supply their name, e-mail address, . . . any high schools, colleges, or universities [that the user] attended[, and] the user's current city[,]" among other things. Griffin, 419 Md. at 353 n.9, 19 A.3d at 421 n.9 (citation omitted).

Edmondson-Westside High School (230382833645773)
Towson University (33627530544)

Page 37 states in pertinent part:

| **Removed Friends** | **User** | Claude Mayo (100009340905913) |
| | **Time** | 2015-12-09 02:36:22 UTC |
| | **Removed By** | 100009404335910 |

Below the "Removed Friends" entry on page 37 is the word "Friends[.]" Starting next to that word, and continuing through page 40, there is a list of 174 names and ID numbers. Neither the name "Claude Mayo," nor the ID number "100009340905913," appears in the Friends list. The name "Skky DaLimit Lynn" is included in the Friends list.

### *Exhibit B – Facebook Business Records for the claude.mayo.5 Profile*

In Exhibit B, which pertains to the claude.mayo.5 profile, page 36 states in pertinent part:

| **Target** | 100009340905913 |
| **Generated** | 2015-12-08 16:42:21 UTC |

* * *

| **Name** | **First** | Claude |
| | **Middle** | |
| | **Last** | Mayo |

| **Registered E[-]mail Addresses** | +14438898253 |

| **Vanity Name** | claude.mayo.5 |

* * *

| **Current City** | Baltimore, Maryland (112438218775062) |

Page 37 of Exhibit B states in pertinent part:

| | |
|---|---|
| **IP Address**[6] | 2607:fb90:136e:b2a:0:9:3f63:4d01 |
| **Time** | 2015-12-08 16:06:42 UTC |
| **Action** | login_attempt_success |
| | |
| **IP Address** | 2607:fb90:136e:b2a:0:9:3f63:4d01 |
| **Time** | 2015-12-08 16:06:41 UTC |
| **Action** | login_bruteforce_protection_delta_not_vetted |
| | |
| **IP Address** | 2607:fb90:136e:b2a:0:9:3f63:4d01 |
| **Time** | 2015-12-08 16:06:41 UTC |
| **Action** | password_check |
| | |
| **IP Address** | 2607:fb90:136e:b2a:0:9:3f63:4d01 |
| **Time** | 2015-12-08 16:06:41UTC |
| **Action** | login_attempt |

The above language is the only instance in which Exhibit B includes the words "attempt," "password," and "protection."

Page 38 includes the word "Connections" near the following: "Patterson High School (Baltimore) (407178879346337)[.]" Below that, page 38 includes the word "Friends[.]" Starting next to that word, and continuing through page 41, there is a list of several names and ID numbers. "SoLo Haze (100009404335910)" and "Shantell Richardson" appear in that list.

Page 18 states in pertinent part:

| | |
|---|---|
| **Target** | 100009340905913 |
| **Generated** | 2015-12-17 19:40:23 UTC |

---

[6]The term "IP address" is derived from the phrase "Internet protocol[,]" and means "the numeric address of a computer on the Internet[.]" IP Address, Merriam-Webster, https://www.merriam-webster.com/dictionary/IP%20address [https://perma.cc/2C7G-TX4Q].

Page 18 includes all of the above-quoted language on page 36, including the name "Claude Mayo," the phone number 14438898253, the vanity name "claude.mayo.5," and the reference to Baltimore City as the "Current City[.]" Like page 38, page 19 refers to Patterson High School in Baltimore as a "Connection[.]"

Page 20 of Exhibit B includes the word "Friends[.]" Starting next to that word, and continuing through the page 23, there is a list of several names and ID numbers. Neither the name "SoLo Haze," nor the ID number "100009404335910," appears in that list.

Page 31 includes a photograph of a male individual. Below the photograph, pages 31 and 32 state in pertinent part:

| | |
|---|---|
| **Title** | Damn rest easy to my lil cuz toot. Now u can live it up with KC. God wanted you, so I can't be mad at that. I'm praying for ALL my family. Gotta be strong for each other. |

* * *

| | | |
|---|---|---|
| **Uploaded Tags[7]** | 2015-12-08 14:39:52 UTC | |
| | **Subject Id** | 100009340905913 |
| | **Subject Name** | Claude Mayo |

* * *

| | | |
|---|---|---|
| **Comments** | **User** | Cash Capo (100008817046384) |
| | **Text** | Damn smh I remember our Lakeland days |
| | **Time** | 2015-12-08 15:12:16 UTC |
| | | |
| | **User** | Sharon Patterson (100000468265896) |
| | **Text** | Sorry to hear of ya love one, sending prayer and may God give you strength |

---

[7]Facebook allows users to "upload photographs[] and . . . 'tag' their friends in the [photographs]. Tagging creates a link in the individual's profile from the photograph, making users easily identifiable, even when the viewer of the photograph is not 'friends' with the photograph's subjects." Griffin, 419 Md. at 353 n.9, 19 A.3d at 421 n.9 (cleaned up).

Page 25 of Exhibit B includes a different photograph of a male individual, with text superimposed on the photograph. Within the copy of the page that is part of the record, some of the text on the photograph is not visible because both the text and part of the photograph appear white. The visible text on the photograph reads:

```
        t Candle
        t Visual
        be held
        orrow
F       m 5:30pm
On lafayette
ave &
Arlington @t
The Park
```

Below the photograph, pages 25 and 26 state in pertinent part:

**Title**      EVERYBODY PLEASE COME OUT TO SUPPORT MY BRO TELL YOUR FRIENDS

* * *

**Uploaded**  2015-12-11 06:49:17 UTC
**Tags**
**Comments**  **User**  Jessica Yayosister Powell (100008547643889)
              **Text**  R.I.P baby ily always and forever ...fly high baby
              **Time**  2015-12-11 07:44:43 UTC

(Ellipsis in original).

Page 27 of Exhibit B includes two different photographs, each of which is of a male individual. Below the photographs, page 27 states in pertinent part:

**Title**      N[****] can't sleep without thinking bout y'all two only god know how I feel thug n peace my 􀀀􀀀􀀀􀀀􀀀􀀀􀀀Angels

- 12 -

stay watching my back cuz #longlive #Toot #Kc[8]

\* \* \*

**Uploaded** 2015-12-14 18:01:50 UTC
**Tags** **Subject Id** 100009340905913
          **Subject Name** Claude Mayo

### *Exhibit C – Certificate of Authenticity of Domestic Records of Regularly Conducted Activity*

Exhibit C is a Certificate of Authenticity of Domestic Records of Regularly Conducted Activity. The certificate states in its entirety:

Under Federal Rule of Evidence 902(11),[9] I[,] __Sarah Propeck__, certify:

1. I am employed by Facebook, Inc., headquartered in Menlo Park, California. I am a duly authorized custodian of records for Facebook[,] and am qualified to certify Facebook's domestic records of regularly conducted activity.

2. I have reviewed the records produced by Facebook in this matter. The records include search results for basic subscriber [i]nformation, IP logs, messages, photo[graph]s, [and] other content and records for 100009404335910 and claude.mayo.5.

3. The records [that are] provided were made and kept by the automated systems of Facebook in the course of regularly conducted activity as a regular practice of Facebook. The records were made at or near the time [that] the information was transmitted by the Facebook user[s].

---

[8]The three preceding terms are known as "hashtags." A "hashtag" is "a word or phrase [that is] preceded by the symbol # that classifies or categorizes the accompanying text (such as a tweet)[.]" Hashtag, Merriam-Webster, https://www.merriam-webster.com/ dictionary/hashtag [https://perma.cc/M4ZP-ZJNC].

[9]Federal Rule of Evidence 902(11) states in pertinent part: "The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted: . . . The original or a copy of a domestic record . . . , as shown by a certification of the custodian[.]" Like Federal Rule of Evidence 902(11), Maryland Rule 5-902(b)(1) provides for self-authentication of business records under certain circumstances.

4. Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing certification is true and correct to the best of my knowledge.

Propeck's name and signature, as well as the date November 3, 2016, appear below the body of the certificate.

**Hearing on the Motion *in Limine***

On August 7, 2017, the day that trial was scheduled to begin, Sample, his counsel, and the prosecutor appeared before the circuit court. The circuit court asked Sample's counsel whether, in the motion *in limine*, she had made any arguments that were not already made at the motions hearing. Sample's counsel clarified that, at the motions hearing, she had requested that the circuit court require the State to call as a witness the custodian of records from Facebook, whereas, in the motion *in limine*, she had requested that the circuit court require the State to call an expert witness. Sample's counsel and the circuit court discussed whether Sample had waived the contentions in the motion *in limine* by not raising them at the motions hearing.

Sample's counsel contended that the Facebook Business Records were inadmissible because no witness would testify that the records pertained to Sample. Sample's counsel argued that this Court has indicated that extrinsic evidence is necessary to connect social media evidence with the person to whom the social media profile allegedly belongs. Sample's counsel asserted that the State needed to prove that Sample had exclusive access to the SoLo Haze Facebook profile, and that he used it to unfriend the claude.mayo.5 Facebook profile.

The prosecutor explained that the State would offer the Facebook Business Records

to prove that Sample and Mayo had been friends on Facebook, and that, after Mayo died, Sample unfriended him on Facebook. The State argued that there were sufficient identifying characteristics in the Facebook Business Records, including the name "SoLo Haze," the e-mail address with "mrsample" in it, and the "Connections" to Towson University, which is in Baltimore County, and Edmondson-Westside High School, which is in Baltimore City, for a reasonable juror to find that the SoLo Haze profile belonged to Sample.

The circuit court indicated that it would review <u>Griffin</u>, 419 Md. 343, 19 A.3d 415, and <u>Sublet</u>, 442 Md. 632, 113 A.3d 695, and rule on the motion *in limine* the following morning. The next day, Sample, his counsel, and the prosecutor appeared before the circuit court, and the court denied the motion *in limine*. The circuit court concluded that Sample had waived the contention as to authentication by failing to raise it in a timely motion *in limine*.[10] As to the merits, the circuit court held that a reasonable juror could find that the SoLo Haze Facebook profile and the claude.mayo.5 Facebook profile belonged to Sample and Mayo, respectively. The circuit court addressed the Facebook Business Records regarding the SoLo Haze profile as follows:

> [The] first name [is "]SoLo[." The] last name [is "]Haze[." I]t actually provides an e[-]mail [address] of m[]rsample2015@[g]mail.com.

> * * *

---

[10]In the petition for a writ of *certiorari*, the State did not present a question as to whether the circuit court correctly concluded that Sample had waived the issue as to authentication. Accordingly, we do not address the matter, aside from observing that, to the extent that Sample may have waived the issue, we exercise our discretion under Maryland Rule 8-131(a) to reach the merits.

It gives the ["C]urrent [C]ity["] as Baltimore. It also gives ["C]onnections[" to] Edmondson-Westside High School and Towson University.

In these particular [Facebook Business R]ecords[ --] I note that the attempted robbery was December the 7th, [2015,] and the [Facebook Business R]ecords [regarding the SoLo Haze Facebook profile] indicate that [] Mayo was removed as a friend just a few days later.[11]

Also[,] importantly, I note that . . . Skky [DaLimit] Lynn is listed as a friend of [] Sample's, and I was told yesterday that Skkyla Lynn was going to be called as a witness. I don't know -- and her name [ha]s two Ks. We had a talk about that. So S-K-K-Y is obviously not at all common[,] and is a friend of [] Sample's.

So[,] I find that there is sufficient proof from which a reasonable juror could find that [the Facebook Business Records regarding the SoLo Haze Facebook profile are] what [they] purport[] to be.

The circuit court addressed the Facebook Business Records regarding the

claude.mayo.5 Facebook profile as follows:

[T]here aren't that many people named Claude. I know two: Claude Debussy, the . . . composer. . . . And one other person.

There aren't that many Claude Mayos. The ["C]onnection["] is [to] Patterson High School. There are [photograph]s of Claude Mayo, and there are numerous posts about [his] passing, so it's not a different Claude Mayo[,] because there's only one Claude Mayo in this area who passed away at the time that all the posts were lodged regarding his passing.

I also noted that in [] Mayo's friend list is Shantell Richardson, and that is his mother. And I know this because[,] last week[,] I signed a body attachment for her,[12] and[,] this morning[,] the deputies brought me word that [] Richardson had been picked up. So[,] there is [an] additional connection. It's not just any Claude Mayo[. I]t's not the wrong Claude Mayo[. I]t's the Claude Mayo connection who's friends with his mother.

So[,] this is -- there is certainly a foundation laid, and there is certainly

---

[11]The circuit court stated that the unfriending occurred "just a few days later"—*i.e.*, a few days after December 7, 2015. The Facebook Business Records regarding the SoLo Haze Facebook profile indicate that the unfriending occurred at 02:36 UTC on December 9, 2015. At trial, Special Agent Wilde testified that the Facebook Business Records regarding the SoLo Haze Facebook profile indicated that the unfriending occurred at 9:36 p.m. EST on December 8, 2015.

[12]According to a docket entry, on August 3, 2017, the circuit court issued a body attachment for Richardson. At trial, the State called Richardson as a witness.

the distinct possibility, rather strong possibility, that there's -- there is proof that a reasonable juror can find that [the Facebook Business Records regarding the "claude.mayo.5" Facebook profile are] exactly what [they] purport[] to be.

That doesn't foreclose [Sample's counsel] from arguing otherwise. The issue of ultimate reliability is left to the jury, so this is one of those times when it goes to the weight, not to the admissibility.

* * *

I do understand, and [Griffin, 419 Md. at 352, 19 A.3d at 421, and Sublet, 442 Md. at 662, 113 A.3d at 713,] talk about the fact, that anyone can create a fictitious [profile], and people can gain access to [other] people's [profile]s, and[,] in the case of [the "claude.mayo.5" Facebook profile], somebody did gain access after his passing.

What's interesting about that is [that] they tried to get in a couple times[,] and didn't get in easily, so I think [that] that person went on -- [it's] certainly reasonable to suggest [that] that person went online to send a message to all of [] Mayo's friends to tell them about the vigil that [had been] scheduled.

**Trial**

At trial, as a witness for the State, Douglas Marcus testified that he owned Towson Wines and Spirits at 6 West Pennsylvania Avenue in Towson. On December 7, 2015, Marcus worked at the store by himself during the day. At 6:50 p.m., Marcus had finished counting cash from the cash register, and Samantha Twist, the store's night manager, arrived. Around that time, two individuals wearing black clothing, including black masks, came into the store. Both individuals pulled their masks down and pulled out revolvers. While testifying, Marcus referred to one of the men as Mayo, and referred to the other man as "the Defendant"—*i.e.*, Sample. According to Marcus, Sample approached Twist, put an arm around her neck, and put his revolver to her neck. Mayo came behind the counter, put his revolver to Marcus's head, grabbed his left arm, and tried to pull him away from

- 17 -

the cash register. Marcus reached into a drawer, pulled out a revolver, and shot Mayo. Sample approached Marcus, who shot Mayo again. Sample and Mayo left the store. The testimony of other State's witnesses established that Mayo died of gunshot wounds outside of the Elks Lodge, which is next door to Towson Wines and Spirits.

As a witness for the State, Detective Christopher Smith of the Baltimore County Police Department testified that, while investigating the attempted armed robbery, he and other detectives reviewed a recording from a surveillance camera at Z-Burger, a restaurant on Allegheny Avenue. The recording showed two individuals in the area of Z-Burger shortly before the attempted armed robbery. One of those two individuals was the person who had died outside of the Elks Lodge. Detective Smith and other detectives determined that the decedent's name was Claude Mayo. In the early morning hours of December 8, 2015, Detective Smith searched for any Facebook profiles associated with the name Claude Mayo. Detective Smith found one, which indicated that its user had connections to Baltimore.[13] The Facebook profile included a photograph of an individual who looked "very similar, if not identical[,]" to Mayo. The Mayo Facebook profile was friends with a profile named "SoLo Haze[,]" and the SoLo Haze profile included a photograph of an individual whose physical characteristics were "very similar" to those of the individual who had been walking with Mayo in the area of Z-Burger. Detective Smith observed that the e-mail address that was registered with the second Facebook profile was

---

[13]At this point, Sample's counsel raised the first of several objections, all of which the circuit court overruled. Sample's counsel requested, and the circuit court granted, a continuing objection to the Facebook-related evidence.

- 18 -

"m[]rsample[]2015@[g]mail.com." Detective Smith took screenshots of both Facebook profiles, and requested records related to both profiles from Facebook. Over Sample's counsel's objection, the circuit court admitted the screenshots of the Facebook profiles into evidence.

Detective Smith testified that photographs in the Facebook Business Records concerning the claude.mayo.5 Facebook profile appeared to be photographs of Mayo. Detective Smith testified that the Facebook Business Records of the SoLo Haze profile indicated that, on the night of December 8, 2015, that profile was used to unfriend the claude.mayo.5 profile.[14] Detective Smith testified that, on the night of December 7, 2015 or the early morning hours of December 8, 2015, he identified Sample as a suspect in the attempted armed robbery. Detective Smith testified that, at the time, Sample's status as a suspect was not yet public. Almost a week later, on December 14, 2015, a warrant for Sample's arrest was served.

On cross-examination, Detective Smith testified that he had seen a Facebook profile with the vanity name "claude.mayo.3[,]" and that the profile included photographs that might have looked similar to those on the claude.mayo.5 profile. Detective Smith testified that there were other Facebook profiles under the name "Claude Mayo." Detective Smith acknowledged that he did not request records from Facebook regarding the "claude.mayo.3" Facebook profile, or any Facebook profile under the name "Claude

_____

[14]Detective Smith testified that the unfriending occurred at 10:36 p.m. EST on December 8, 2015. Special Agent Wilde testified that the unfriending occurred at 9:36 p.m. EST on December 8, 2015.

Mayo" other than the claude.mayo.5 profile. Detective Smith testified that the claude.mayo.5 profile contained postings that were made after Mayo died on December 7, 2015, and that meant that someone other than Mayo used the claude.mayo.5 profile after Mayo's death. Detective Smith acknowledged that people can have access to profiles that they did not create and be Facebook friends with someone that they have never met. Detective Smith testified that there were other Facebook profiles under the name "SoLo Haze," and that, other than what the Facebook Business Records show, he did not know whether Sample's nickname was "SoLo Haze."

During Detective Smith's redirect examination, the prosecutor elicited that the claude.mayo.5 profile was friends with a Facebook profile under the name "Shantell Richardson[,]" who is Mayo's mother. The prosecutor elicited that, unlike the claude.mayo.5 profile—which included an image announcing a candlelight vigil—the "claude.mayo.3" Facebook profile did not include any references to Mayo's death. Detective Smith testified that he requested records from Facebook regarding the claude.mayo.5 profile, rather than the "claude.mayo.3" Facebook profile, because he believed that there was "a stronger connection" between Mayo and the claude.mayo.5 profile. The prosecutor elicited that, to Detective Smith's knowledge, the "[m]r[s]ample2015@gmail.com" e-mail address was registered with only one Facebook profile under the name "SoLo Haze[.]" The prosecutor elicited that the Facebook Business Records indicated that the claude.mayo.5 profile was the only one unfriended from the SoLo Haze profile during the dates to which the Facebook Business Records pertained.

As a witness for the State, Detective Robert Caskey of the Baltimore County Police

Department testified that, on December 14, 2015, he and Detective Smith met with Sample in an interview room at a police station. Detective Caskey acknowledged that no recording of his and Detective Smith's interview of Sample was available. Detective Caskey testified that Sample waived his <u>Miranda</u> rights and agreed to provide a statement. One of the detectives asked Sample whether he was in the Towson area during the time of the attempted armed robbery. Sample responded in the negative, and said that, at the time, he was in Baltimore City at the residence of Skkyla Lynn, who is the mother of his child. Detective Caskey asked Sample whether he had known Mayo, and he responded in the negative.

As a witness for the State, Detective Gary Childs of the Baltimore County Police Department testified that, on December 7, 2015, at approximately 10:30 or 11 p.m., he learned that a woman had been calling several hospitals and asking about her son, who she believed had been involved in the attempted armed robbery. Detective Childs learned that the woman was Richardson, and that her son was Mayo. Detective Childs met with Richardson, and, before informing her of Mayo's death, asked her what phone numbers Mayo had used. Richardson provided the number 443-707-6420. Detective Childs also spoke to a man named Wilkins, who knew Sample and provided the phone number 443-403-9522. Detective Childs sought and received phone records for the two numbers. The phone records, which the circuit court admitted into evidence, indicated that, on December 7, 2015, in the afternoon and early evening, the two phone numbers called each other several times.

As a witness for the State, Special Agent Mathew Wilde of the Federal Bureau of

Investigation testified that he was a member of its Cellular Analysis Survey Team. The circuit court admitted Special Agent Wilde as an expert in the field of historical cellular record analysis. Special Agent Wilde testified that he analyzed cell phone records for the number 443-403-9522 to determine the location of the cell phone on December 7, 2015. Special Agent Wilde explained that he could determine the location of the cell phone only at the times when it made or took calls. Special Agent Wilde testified that, on December 7, 2015, at 5:22 p.m., the cell phone was used to call 443-707-6420 from the area of Hollins Market, and that was the last contact between the two numbers. At 6:04 p.m., and at 6:21 p.m., the cell phone was in the area of 6 West Pennsylvania Avenue in Towson.

During closing argument, Sample's counsel addressed the Facebook-related evidence as follows:

> The Facebook[-related] evidence was fascinating, and I submit that those records just aren't reliable. It's the nature of the medium itself and who can post information, who can open an account, who can take down information. It's not that secure, and I think it came out that . . . anybody could open up a Facebook page under any name[,] and there is no checkup, just none.
> Could go so far as to [P]hoto[]shop[15] someone's face on[]to your body and post that picture on [Facebook], and there is no check on that. So, under those circumstances, unless they can tell you specifically who, when[,] and what device was used, and tie that device to a specific individual at a certain time, they're speculating. The lack of reliability alone should raise a reasonable doubt.

The jury found Sample guilty of attempted robbery with a dangerous weapon, first-

---

[15]When used as a verb, "Photoshop" means "to alter (a digital image) with Photoshop software or other image-editing software[,] especially in a way that distorts reality (as for deliberately deceptive purposes)[.]" *Photoshop*, Merriam-Webster, https://www.merriam-webster.com/dictionary/photoshop [https://perma.cc/3K6E-6MKD].

degree assault, possession of a handgun after conviction of a disqualifying crime, and two counts of use of a handgun in the commission of a felony or crime of violence. The circuit court sentenced Sample to twenty years of imprisonment for attempted robbery with a dangerous weapon, five years concurrent (without the possibility of parole) for one count of use of a firearm in the commission of a crime of violence, twenty-five years consecutive for first-degree assault, five years concurrent (without the possibility of parole) for the other count of use of a firearm in the commission of a crime of violence, and five years consecutive for possession of a firearm after conviction of a disqualifying crime.

## Opinion of the Court of Special Appeals

Sample appealed. On July 31, 2019, the Court of Special Appeals reversed Sample's convictions and remanded for a new trial. See Sample, 2019 WL 3451812, at *5. The Court of Special Appeals held that the circuit court abused its discretion in admitting information related to the Facebook Business Records because there was insufficient evidence to show that Sample used the SoLo Haze Facebook profile to unfriend the claude.mayo.5 Facebook profile. See id. at *4. The Court of Special Appeals reasoned:

> Although there may have been enough evidence for a juror to conclude that the [SoLo Haze Facebook profile] was created by [Sample], the State failed to proffer any evidence to show that [Sample unfriended] the [claude.mayo.5 Facebook profile]. Unlike the consolidated cases in *Sublet*, [442 Md. 632, 113 A.3d 695,] there was effectively no evidence that [Sample] took the action at issue.
> The State stresses that relatively few people would have known of the shooting at the time [the ]So[L]o Haze [Facebook profile un]friended [the c]laude[.m]ayo[.]5[ Facebook profile]. There is, however, insufficient evidence for a reasonable juror to conclude that [Sample] was the person who took that action. Another person within the same social circle could have heard of the shooting in the more than twenty-four hours after the shooting, accessed the So[L]o Haze [Facebook profile], and removed Mayo as a friend

- 23 -

of the profile. That possibility is demonstrated by the fact that someone logged into the [c]laude[.m]ayo[.]5 profile after Mayo's death and posted a fl[y]er for Mayo's [candlelight vigil]. Without evidence of [Sample] controlling the profile (such as evidence linking the profile to [Sample]'s phone or computer), a reasonable juror could only speculate that [Sample] took the action at issue. By admitting the action [that had been] taken on the "So[L]o Haze" Facebook p[rofile] without a showing that [Sample] took that action, the circuit court abused its discretion.

Sample, 2019 WL 3451812, at *4 (cleaned up).[16]

## Petition for a Writ of *Certiorari*

On September 20, 2019, the State petitioned for a writ of *certiorari*, raising the following issue: "Did the Court of Special Appeals err by holding that the mere abstract possibility of unauthorized access to Sample's Facebook account barred any reasonable juror from finding that [Sample] was responsible for the account entry in question ([unfriending the claude.mayo.5 Facebook profile)]?" On November 6, 2019, this Court granted the petition. See Sample, 466 Md. 310, 219 A.3d 526.

## DISCUSSION

### The Parties' Contentions

The State contends that the circuit court determined, and the Court of Special Appeals did not dispute, that a reasonable juror could have found that the SoLo Haze Facebook profile belonged to Sample. The State argues that the Court of Special Appeals's theory that another person in Sample's social circle may have used the SoLo Haze profile

---

[16]Because the Court of Special Appeals agreed with Sample that the circuit court abused its discretion in admitting the Facebook-related evidence, the Court did not address Sample's other contentions, see Sample, 2019 WL 3451812, at *5 n.1—namely, that the circuit court erred in denying motions for a mistrial, see id. at *1.

to unfriend the claude.mayo.5 profile is not grounded in evidence. The State asserts that, without more, the evidence that the SoLo Haze profile belonged to Sample would allow a reasonable juror to find that he used that profile to unfriend the claude.mayo.5 profile. The State maintains that such a finding would be supported by other circumstances, including that Sample was one of "select [f]ew people" with a motive to sever ties with Mayo the day after the attempted armed robbery and Mayo's death, and that Sample's and Mayo's cell phones called each other multiple times in the hours leading up to the crime, but Sample denied knowing Mayo during an interview with detectives.

The State contends that the Court of Special Appeals erred in reasoning that, because it was possible that someone other than Sample used the SoLo Haze Facebook profile to unfriend the claude.mayo.5 Facebook profile, no reasonable juror could find that Sample was the one who did so. The State argues that such a possibility went to the weight, not the admissibility, of the Facebook-related evidence. The State asserts that, contrary to the Court of Special Appeals's reasoning, the circumstance that someone logged into the claude.mayo.5 profile after Mayo's death did not establish that no reasonable juror could find that Sample used the SoLo Haze profile to unfriend the claude.mayo.5 profile.

Sample responds that, although there was evidence that he had created the SoLo Haze Facebook profile, the State failed to meet the burden of offering evidence sufficient to demonstrate that he used the SoLo Haze profile to unfriend the claude.mayo.5 profile. Sample points out that there was not any technical evidence, such as testimony regarding research of his phone or computer, linking him to the unfriending of the claude.mayo.5 profile. Sample argues that, without more, the act of unfriending the claude.mayo.5 profile

did not reveal who did so. Sample asserts that the circumstance that someone logged into the claude.mayo.5 profile after Mayo's death shows that it was not farfetched to infer that someone other than him could have used the SoLo Haze profile to unfriend the claude.mayo.5 profile.

**Standard of Review**

An appellate court reviews for abuse of discretion a trial court's determination that social media evidence was sufficiently authenticated. See Sublet, 442 Md. at 676, 113 A.3d at 721; Griffin, 419 Md. at 357, 19 A.3d at 423.

**Authenticating Social Media Evidence**

Maryland Rule 5-901 governs authentication and states in pertinent part:

(a) General Provision

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations

By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Rule:

(1) Testimony of Witness With Knowledge

Testimony of a witness with knowledge that the offered evidence is what it is claimed to be.

\* \* \*

(4) Circumstantial Evidence

Circumstantial evidence, such as appearance, contents, substance, internal patterns, location, or other distinctive

characteristics, that the offered evidence is what it is claimed to be.

(Cross reference omitted).

In Griffin, 419 Md. at 347, 357, 19 A.3d at 418, 423-24, a case involving a murder prosecution, this Court held that a trial court abused its discretion in admitting, at the State's request, alleged printouts of the defendant's girlfriend's MySpace profile, as the same had not been sufficiently authenticated under Maryland Rule 5-901(b)(4). At trial, the State sought to introduce printouts of the defendant's girlfriend's MySpace profile to prove that, prior to trial, the girlfriend allegedly threatened a State's witness. See id. at 348, 19 A.3d at 418. The printouts, which were of a MySpace profile named "Sistasouljah," indicated that the profile belonged to a twenty-three-year-old woman who lived in Port Deposit, and listed October 2, 1983 as the woman's date of birth. See id. at 348, 19 A.3d at 418. The printouts included the following "blurb":[17] "FREE BOOZY!!!! JUST REMEMBER SNITCHES GET STITCHES!! U KNOW WHO YOU ARE!!" Griffin, 419 Md. at 348, 19 A.3d at 418. "Boozy" was allegedly the defendant's nickname. Id. at 350, 19 A.3d at 419.

The State called the defendant's girlfriend as a witness, but the prosecutor did not question her about the printouts. See id. at 348, 19 A.3d at 418. Rather, the State sought to authenticate the printouts through the testimony of the lead investigator. See id. at 348,

---

[17]This Court explained "blurbs" on MySpace profiles as follows: "MySpace profiles contain several informational sections, known as 'blurbs.' These include two standard blurbs: 'About Me' and 'Who I'd Like to Meet.' Users may supplement those blurbs with additional sections about their interests, general additional details, and other personal information." Griffin, 419 Md. at 351, 19 A.3d at 420 (citation omitted).

19 A.3d at 418. The defendant's counsel objected to the admission of the printouts, contending that there was insufficient evidence of a connection between the defendant's girlfriend and the "Sistasouljah" MySpace profile as well as the blurb. See id. at 348, 19 A.3d at 418. During *voir dire* outside of the presence of the jury, in response to a question as to how he knew that the "Sistasouljah" MySpace profile belonged to the defendant's girlfriend, the lead investigator testified that the "Sistasouljah" MySpace profile listed the defendant's girlfriend's date of birth, that the blurb referred to "Boozy," and that there was a photograph of "Boozy" and the woman. Id. at 349, 19 A.3d at 418. The trial court observed that the woman looked like the defendant's girlfriend. See id. at 349, 19 A.3d at 418-19.

The trial court indicated that it would permit the detective to testify about a redacted version of the printouts, which contained the photograph of the person who looked like the girlfriend, the description of the woman as a twenty-three-year-old woman from Port Deposit, and the blurb about snitches getting stitches. See id. at 350, 19 A.3d at 419. The defendant's counsel objected to the admission of the investigator's testimony about the printouts, but joined a stipulation that was read to the jury. See id. at 350, 19 A.3d at 419. The stipulation advised that the lead investigator would have testified that he made the printouts, that he recognized the woman in the photograph as the defendant's girlfriend, and that she told him her date of birth was October 2, 1983. See id. at 350, 19 A.3d at 419.

The jury found the defendant guilty. See id. at 346, 19 A.3d at 417. The defendant appealed, and the Court of Special Appeals affirmed. See id. at 346, 19 A.3d at 417. The defendant filed a petition for a writ of *certiorari*, which this Court granted. See id. at 346,

19 A.3d at 417. This Court reversed and remanded for a new trial. See id. at 347-48, 19 A.3d at 418. This Court observed that the prosecutor did not attempt to authenticate the printouts through the testimony of a witness with knowledge under Maryland Rule 5-901(b)(1), as the prosecutor did not ask the defendant's girlfriend about the printouts. See id. at 355 & n.11, 19 A.3d at 422 & n.11. This Court determined that the prosecutor did not sufficiently authenticate the printouts through circumstantial evidence under Maryland Rule 5-901(b)(4), as the printouts' inclusion of the defendant's girlfriend's date of birth, the town in which she lived, and the photograph of her did not sufficiently indicate that she created the "Sistasouljah" MySpace profile and wrote the blurb. See id. at 357, 19 A.3d at 423-24. This Court explained:

> The potential for abuse and manipulation of a social networking [web]site by someone other than its purported creator and/or user leads to our conclusion that a printout of an image from such a [web]site requires a greater degree of authentication than merely identifying the date of birth of the creator and her visage in a photograph on the ["Sistasouljah" MySpace profile] to reflect that [the defendant's girlfriend] was its creator and the author of the [blurb].

Id. at 357-58, 19 A.3d at 424 (footnote omitted).

We cautioned that the holding did not mean "that printouts from social networking [web]sites should never be admitted[,]" and we suggested methods for authenticating the same. Id. at 363, 19 A.3d at 427. We suggested that the proponent of the social media evidence could authenticate the evidence through the testimony of a person with knowledge under Maryland Rule 5-901(b)(1) by asking the person to whom the social networking profile allegedly belongs whether that person created the profile and authored the posting in question. See id. at 363, 19 A.3d at 427. Another option would be to search

the device of the person who allegedly created the profile or posting at issue and examine the device's internet history and hard drive to determine whether the device was used to create the social networking profile and posting. See id. at 363, 19 A.3d at 427. A third option would be to "obtain information directly from the social networking website that links the establishment of the profile to the person who allegedly created it[,] and also links the posting sought to be introduced to the person who initiated it." Id. at 364, 19 A.3d at 428.

In a dissenting opinion that the Honorable Joseph F. Murphy, Jr. joined, the Honorable Glenn T. Harrell, Jr. stated that he would adopt the test for authentication that nearly all United States Courts of Appeals, including the Second Circuit, had embraced. See id. at 366, 19 A.3d at 429 (Harrell, J., dissenting). Under that test, "'a document is properly authenticated if a reasonable juror could find in favor of authenticity.'" Id. at 366, 19 A.3d at 429 (Harrell, J., dissenting) (quoting United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007)) (cleaned up). Applying the "reasonable juror" test, Judge Harrell concluded that, in light of the circumstantial evidence, a reasonable juror could have found that the defendant's girlfriend was the one who wrote the blurb. See Griffin, 419 Md. at 367, 19 A.3d at 429 (Harrell, J., dissenting).

Four years after Griffin, in 2015, in Sublet, 442 Md. at 678, 113 A.3d at 722, in an opinion that consolidated three cases, this Court held that, to authenticate social media evidence, there must be proof from which a reasonable juror could find that the evidence is what it purports to be. Utilizing this standard in each of the three cases, this Court affirmed the trial court's judgment. See id. at 678, 113 A.3d at 722. This Court observed

that, in <u>Griffin</u>, 419 Md. at 363-64, 19 A.3d at 427-28, we had "suggested . . . three non-exclusive" methods of sufficiently authenticating printouts from social networking websites. <u>Sublet</u>, 442 Md. at 663, 113 A.3d at 713 (emphasis omitted).

This Court observed that, in <u>United States v. Vayner</u>, 769 F.3d 125 (2d Cir. 2014), which involved facts that were analogous to <u>Griffin</u>'s, the Second Circuit, quoting Federal Rule of Evidence 901, stated that, "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." <u>Sublet</u>, 442 Md. at 664, 666, 113 A.3d at 714, 715. The Second Circuit instructed that "this requirement is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." <u>Sublet</u>, 442 Md. at 666, 113 A.3d at 715 (quoting <u>Vayner</u>, 769 F.3d at 129-30) (cleaned up). We quoted the following language from <u>Vayner</u>, 769 F.3d at 130: "[T]he proponent [of social media evidence] need not rule out all possibilities [that are] inconsistent with authenticity, or prove beyond any doubt that the [social media] evidence is what it purports to be[.]" <u>Sublet</u>, 442 Md. at 666, 113 A.3d at 715 (cleaned up). Again, quoting <u>Vayner</u>, 769 F.3d at 131, we stated:

> [A]uthentication[,] of course[,] merely renders evidence admissible, leaving the issue of its ultimate reliability to the jury. Thus, after the proponent of the evidence has adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be, the opposing party remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence—not to its admissibility.

<u>Sublet</u>, 442 Md. at 668-69, 113 A.3d at 716-17 (cleaned up). Consistent with the Second Circuit's opinion in <u>Vayner</u> and the dissent in <u>Griffin</u>, 419 Md. at 366, 19 A.3d at 429

(Harrell, J., dissenting), for purposes of social media evidence, this Court adopted the "reasonable juror" test used by most United States Courts of Appeals, including the Second Circuit. See Sublet, 442 Md. at 671, 113 A.3d at 718. We held that, to admit social media evidence, a trial court "must determine that there is proof from which a reasonable juror could find that the evidence is what the proponent claims[.]" Id. at 678, 113 A.3d at 722.

In the first of the consolidated cases, Sublet v. State, where, during an assault trial, the defendant's counsel sought to introduce into evidence printouts of a conversation on a Facebook page indicating that the defendant had not been the aggressor, this Court concluded that two of the entries on the Facebook page were not sufficiently authenticated, as there was testimony that the owner of the Facebook page (the person who was alleged to have made the entries) permitted others to use her username and password. See Sublet, 442 Md. at 638-39, 672, 113 A.3d at 698-99, 718-19. The owner of the page testified that she had shared her Facebook username and password with others, and that other people could presumably access her Facebook page and input information. See id. at 672, 113 A.3d at 719. We held that no reasonable juror could have found that the owner of the Facebook page made the postings at issue. See id. at 672-73, 113 A.3d at 718-19. We observed that the defendant's counsel did not authenticate the postings through the testimony of a witness with knowledge under Maryland Rule 5-901(b)(1), as the owner of the Facebook page expressly denied making the postings. See id. at 672, 113 A.3d at 718-19.

This Court determined that the defendant's counsel did not sufficiently authenticate the postings through circumstantial evidence under Maryland Rule 5-901(b)(4), as the

postings "were devoid of unique characteristics" indicating authenticity. Id. at 672-73, 113 A.3d at 719. This Court noted that the two postings at issue in the Facebook profile printouts "ma[d]e no reference to the circumstances underlying" the case, were "disconnected entirely" from the previous postings by that profile, and did "not refer to []or answer any of the previous" postings by other profiles. Id. at 673, 113 A.3d at 719. This Court pointed out that, apart from unauthenticated handwritten notations, the printouts did not make clear the dates on which any of the postings occurred. See id. at 673 & n.42, 113 A.3d at 719 & n.42. This Court explained that the owner's testimony that other people knew her Facebook username and password, and had used her Facebook profile to make postings, undermined the owner's authorship of the postings. Id. at 672, 113 A.3d at 719.

In the second case, Harris v. State, where, during an attempted murder trial, the State sought to introduce testimony concerning direct messages sent by Twitter to another person from the defendant's iPhone and tweets obtained from the defendant's Android phone, indicating that he planned to shoot one of the victims in the case in retaliation for an earlier altercation, this Court determined that a reasonable juror could find that the direct messages and tweets were authentic. See Sublet, 442 Md. at 645-46, 675-76, 113 A.3d at 702-03, 720-21. The State argued that a witness had identified the name on the Twitter account "TheyLovingTC" as the defendant's Twitter name, and photographs accompanying the messages were of the defendant. See id. at 674, 113 A.3d at 720. The State pointed out that the content of the direct messages indicated that the author knew in advance of the planned retaliatory shooting. See id. at 674, 113 A.3d at 720. This Court agreed with the State that there were sufficient distinctive characteristics concerning the direct messages

- 33 -

and tweets "from which the trial [court] could determine that a reasonable juror could find the 'direct messages' and tweets [to be] authentic[.]" Id. at 674, 113 A.3d at 720.

In determining that the direct messages had been properly authenticated, we observed that the circumstance that the planned shooting occurred the day after the direct messages were sent indicated that the messages were written by someone with knowledge of the plan, and a witness had testified that only seven people, including the defendant, heard the conversation about the plan for revenge that was later relayed over social media in the direct messages. See id. at 674-75, 113 A.3d at 720. We noted that the direct messages referenced a plan for retaliation that had "been created in response to events occurring that same day." Id. at 674, 113 A.3d at 720. We observed that there had been testimony that the "TheyLovingTc" Twitter profile belonged to the defendant. See id. at 674-75, 113 A.3d at 720. We concluded that, based on the temporal proximity of the tweets (which were authored within ten minutes of the direct messages) to the direct messages, and the circumstance that the direct messages had been sufficiently authenticated, a reasonable juror could also have found that the tweets were authentic. See id. at 675-76, 113 A.3d at 720-21. In other words, this Court determined that a reasonable juror could determine that the defendant used the "TheyLovingTc" Twitter profile to write the direct messages as well as tweets. See id. at 675-76, 113 A.3d at 720-21.

In the third case, Monge-Martinez v. State, during an attempted murder trial in which the defendant, Carlos Monge-Martinez, was accused of stabbing his former girlfriend, the State sought to introduce Facebook messages allegedly sent on the same day of the stabbing by the defendant from a Facebook profile named "Carlos Monge" to his

- 34 -

former girlfriend indicating remorse for his actions. See Sublet, 442 Md. at 652-53, 113 A.3d at 707. The State argued that there was sufficient evidence to authenticate the messages because the former girlfriend testified that the defendant wrote the messages, the date and time stamps on the messages indicated that they were sent on the same day of the stabbing, and the messages were written in Spanish, the defendant's native language, and referenced the stabbing. See id. at 676-77, 113 A.3d at 721. We agreed. See id. at 676, 113 A.3d at 721.

We determined that the State sufficiently authenticated the messages through circumstantial evidence under Maryland Rule 5-901(b)(4). See id. at 677, 113 A.3d at 721. We concluded that the question of whether the defendant authored the Facebook messages could be determined by the distinctive characteristics of the messages. See id. at 677, 113 A.3d at 721. We observed that the messages were received on the day of the stabbing, when the defendant was among few people who knew about it, that the messages contained expressions of remorse, and that the defendant began telephoning his former girlfriend shortly after the messages were sent. See id. at 677 & n.46, 113 A.3d at 721-22 & n.46. We noted that the messages were in Spanish, the defendant's first language, as was a note that was left in the former girlfriend's residence on the date of the stabbing, as well as a letter that the former girlfriend received the following month in which the defendant sought forgiveness. See id. at 677, 113 A.3d at 721-22. We held that it was not dispositive that the messages did not include any of the defendant's biographical information, such as his date of birth. See id. at 676, 113 A.3d at 721. In sum, we concluded that a reasonable juror could determine that the defendant used the "Carlos Monge" Facebook profile to send the

messages at issue to his former girlfriend.  See id. at 677, 113 A.3d at 722.

**Analysis**

Here, we conclude that the circuit court did not abuse its discretion in admitting the Facebook-related evidence, as there was sufficient circumstantial evidence under Maryland Rule 5-901(b)(4) for a reasonable juror to find that the SoLo Haze Facebook profile belonged to Sample, that the claude.mayo.5 Facebook profile belonged to Mayo, and that Sample used the SoLo Haze profile to unfriend the claude.mayo.5 profile.

We begin by explaining the standard of proof for authentication of social media evidence under Maryland Rule 5-901(a), which states that a party can sufficiently authenticate a piece of evidence through "evidence [that is] sufficient to support a finding that the matter in question is what its proponent claims."  As discussed, in Sublet, 442 Md. at 671, 678, 113 A.3d at 718, 722, this Court adopted the "reasonable juror" test from federal case law for authentication of social media evidence.  Although this Court did not mention the term "preponderance of the evidence" in its discussion in Sublet, this Court's adoption of the "reasonable juror" test necessarily means that, for a trial court to admit social media evidence, there must be sufficient evidence for a reasonable juror to find that the social media evidence is authentic by a preponderance of the evidence.

In Griffin, 419 Md. at 358 n.12, 19 A.3d at 424 n.12, we observed that the "reasonable juror" test is derived from Federal Rule of Evidence 104(b).  The Advisory Committee Notes as to Federal Rule of Evidence 901, which pertains to authentication, state that the "requirement of showing authenticity . . . falls in the category of relevancy dependent upon fulfillment of a condition of fact[,] and is governed by the procedure set

forth in [Federal] Rule [of Evidence] 104(b)."[18]  Federal Rule of Evidence 104(b) states:

"When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."  The Supreme Court has explained that, under Federal Rule of Evidence 104(b), the question is whether a "jury could reasonably find the conditional fact . . . by a preponderance of the evidence." Huddleston v. United States, 485 U.S. 681, 690 (1988) (citation omitted).[19]  In other words, under Federal Rule of Evidence 104(b), the issue is whether "a reasonable jury [could] find the conditional fact by a preponderance of the evidence[.]"  United States v. Balthazard, 360 F.3d 309, 313 (1st Cir. 2004) (citing Huddleston, 485 U.S. at 689-90).  As such,  in United States v. Browne, 834 F.3d 403, 413 (3d Cir. 2016), the Third Circuit held that "the Government provided more than adequate extrinsic evidence to support that [certain] Facebook records reflected online conversations that took place between [the defendant, another person, and] minors, such that the jury could reasonably find the authenticity of the records by a preponderance of the evidence."  (Cleaned up).

In sum, by adopting the "reasonable juror" test in Sublet, 442 Md. at 671, 113 A.3d at 718, this Court concurrently adopted the "preponderance of the evidence" standard of

---

[18]Similarly, Maryland Rule 5-901(a) includes a cross-reference to Maryland Rule 5-104(b), which states: "When the relevance of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding by the trier of fact that the condition has been fulfilled."

[19]Similarly, this Court has stated that the "preponderance of the evidence" standard of proof applies to determinations by trial courts under Maryland Rule 5-104(a), which provides in pertinent part: "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of [Maryland Rule 5-104](b)."  Crane v. Dunn, 382 Md. 83, 92, 854 A.2d 1180, 1185 (2004) (citation omitted).

proof that goes with the test. For a trial court to admit social media evidence, there must be sufficient evidence for a reasonable juror to find that the social media is authentic by a preponderance of the evidence. "[P]reponderance of the evidence" means "more likely than not[.]" Pete v. State, 384 Md. 47, 60 n.15, 862 A.2d 419, 426 n.15 (2004) (citations omitted). Accordingly, we reaffirm our holding in Sublet, 442 Md. at 678, 113 A.3d at 722, and conclude that, where there is an issue as to authenticating social media evidence, the question is whether there is sufficient evidence for a reasonable juror to find that it is more likely than not that the social media evidence is what the proponent of the evidence purports it to be.[20]

Where a party attempts to authenticate social media evidence through circumstantial evidence under Maryland Rule 5-901(b)(4), "the inquiry is context-specific[,]" and the presence or absence of certain biographical information—such as the relevant person's date of birth—is not necessarily dispositive. Sublet, 442 Md. at 676-77, 113 A.3d at 721. When attempting to sufficiently authenticate social media evidence through circumstantial evidence under Maryland Rule 5-901(b)(4), the party "need not rule out all possibilities [that are] inconsistent with authenticity, or prove beyond any doubt that the [social media]

---

[20]We are not the first State court to apply the "reasonable juror" test and the "preponderance of the evidence" standard of proof to authenticating electronic evidence. In Commonwealth v. Purdy, 945 N.E.2d 372, 379 (Mass. 2011), the Supreme Judicial Court of Massachusetts explained: "The role of the trial [court] in jury cases is to determine whether there is evidence sufficient, if believed, to convince the jury[,] by a preponderance of the evidence[,] that the item in question is what the proponent claims[.]" (Cleaned up). The Court went on to hold that there were "confirming circumstances [that were] sufficient for a reasonable jury to find[,] by a preponderance of the evidence[,] that the defendant authored [certain] e-mails." Id. at 381 (cleaned up).

evidence is what it purports to be[.]" Id. at 666, 113 A.3d at 715 (quoting Vayner, 769 F.3d at 130) (cleaned up).

Here, there was sufficient circumstantial evidence under Maryland Rule 5-901(b)(4) for the circuit court to conclude that a reasonable juror could find that it was more likely than not that the SoLo Haze Facebook profile belonged to Sample. Part of the name of the Facebook profile, "Haze," is a homophone of "Hayes," Sample's first name. Only two e-mail addresses were registered with the "SoLo Haze" Facebook profile: a "facebook.com" e-mail address, and "mrsample2015@gmail.com[.]" The "mrsample2015@gmail.com" e-mail address includes not only Sample's last name, but also the title "mr[,]" which indicates that the e-mail address most likely belongs to a man with the last name "Sample." The list of "Friends" for the "SoLo Haze" Facebook profile includes a Facebook profile under the name "Skky DaLimit Lynn[.]" At the hearing on the motion *in limine*, Sample's counsel informed the circuit court that Sample would call Skkyla Lynn as a witness. When ruling on the motion *in limine*, the circuit court observed that Sample was calling as a witness a person with a name that was similar to the "Skyy DaLimit Lynn" profile, which was listed as a friend of the SoLo Haze profile.[21] The "Current City" for the SoLo Haze profile is listed as Baltimore, and the list of "Connections" for the profile includes Edmondson-Westside High School and Towson University. The references to Baltimore City and Towson indicate that the Facebook profile is connected to someone in the Baltimore area,

---

[21]At trial, Detective Caskey testified that Sample told detectives that Skkyla Lynn was the mother of his child, and that he was at her residence during the attempted armed robbery.

as opposed to someone in a different or unknown location. In other words, the SoLo Haze profile contained sufficient distinctive characteristics from which the circuit court could determine that a reasonable juror could find that Sample was the owner of the profile. See Sublet, 442 Md. at 674, 113 A.3d at 720. In any event, Sample does not deny and indeed acknowledges that there is sufficient evidence for a reasonable juror to conclude that the SoLo Haze profile belongs to him; rather, Sample merely contends that his ownership of the account does not establish that he used the account to unfriend the Mayo profile.

There was also sufficient circumstantial evidence under Maryland Rule 5-901(b)(4) for the circuit court to conclude that a reasonable juror could find it was more likely than not that the claude.mayo.5 Facebook profile belonged to Mayo. The claude.mayo.5 profile was under the name "Claude Mayo," which was Mayo's name. The list of "Friends" for the claude.mayo.5 profile includes a Facebook profile under the name "Shantell Richardson[,]" which was Mayo's mother's name. Indeed, when ruling on the motion *in limine*, the circuit court observed that Shantell Richardson was Mayo's mother and that the court had issued a body attachment for her in the case. The Facebook Business Records show that, at one point, the claude.mayo.5 profile listed the SoLo Haze profile as a friend. And, the Facebook Business Records regarding the claude.mayo.5 profile include multiple photographs that, according to the circuit court, are of Mayo, and contain references to his death.

In addition to observing that the claude.mayo.5 profile contained Mayo's name and was friends with a profile with Mayo's mother's name, the circuit court concluded that information in the claude.mayo.5 profile consisting of posts about Mayo's death indicated

that the profile belonged to Mayo. The circuit court observed that the Facebook Business Records regarding the claude.mayo.5 profile indicate that, on December 8, 2015, someone tried to log into that profile twice, and only the second attempt was successful. On December 8, 2015, someone uploaded a photograph of a male individual to the claude.mayo.5 profile, "tagged" it to indicate that it was a photograph of Mayo, and included the phrases "rest easy[,]" "God wanted you," and "I'm praying for ALL my family" in the "Title[.]" On the same day, a Facebook profile under the name "Sharon Patterson" added the following comment to the photograph: "Sorry to hear of ya love one, sending prayer and may God give you strength[.]" On December 11, 2015, someone uploaded a different photograph of a male individual to the claude.mayo.5 profile, with text superimposed on the photograph that included the words "Candle" and "Visual[,]" as well as a reference to the park near the intersection of Lafayette and Arlington streets. The circuit court interpreted the text as an announcement of a candlelight vigil in response to Mayo's death. On the same day, a Facebook profile under the name "Jessica Yayosister Powell" added the following comment to the photograph: "R.I.P baby ily always and forever ...fly high baby[.]" (Ellipses in original). All of these occurrences constitute circumstantial evidence that, before his death, Mayo was the owner of the claude.mayo.5 profile. Put simply, the profile contained sufficient distinctive characteristics from which the circuit court could conclude that a reasonable juror could find that the claude.mayo.5 profile belonged to Mayo.

We are satisfied that there was sufficient circumstantial evidence under Maryland Rule 5-901(b)(4) for a reasonable juror to find it was more likely than not that Sample used

- 41 -

the SoLo Haze Facebook profile to unfriend the claude.mayo.5 Facebook profile.[22] In and of itself, the ample evidence that the SoLo Haze profile belonged to Sample constitutes strong evidence that he was responsible for the unfriending. In concluding that there was sufficient evidence from which a reasonable juror could find that the SoLo Haze profile belonged to Sample and that the claude.mayo.5 profile belonged to Mayo, the circuit court did not abuse its discretion in permitting Detective Smith to testify that Sample unfriended Mayo. The circumstances that surrounded the unfriending more than support the conclusion that a reasonable juror could find that Sample unfriended the Mayo profile. In the seventeen-day period to which the Facebook Business Records pertain (from 7:00 p.m. EST on November 30, 2015 through 6:59 p.m. EST on December 17, 2015), of the 175 Facebook profiles with which the SoLo Haze Facebook profile was friends, the claude.mayo.5 Facebook profile was the only one unfriended by the SoLo Haze Facebook profile. The Facebook Business Records demonstrate that the unfriending occurred at 9:36 p.m. EST on December 8, 2015 (based on UTC). That was the day after Mayo's death, which occurred near the scene of the attempted armed robbery on December 7, 2015.

Given that there was evidence that Sample was the surviving attempted robber, *i.e.*, Mayo's accomplice, Sample had a motive to sever ties with Mayo after the attempted armed robbery. At the hearing on the motion *in limine*, the State argued that surveillance

---

[22]Although the circuit court did not make a specific finding regarding Sample having used the SoLo Haze profile to unfriend the claude.mayo.5 profile, the record demonstrates that the State argued at the hearing on the motion *in limine* that the State's purpose in introducing the Facebook Business Records was to show that, after Mayo's death, Sample unfriended him.

video showed the two men walking together about fourteen minutes before the crime occurred. The State also argued that cell phone records showed that there was a phone call made by Sample to Mayo about an hour before the crime occurred. And significantly, the State pointed out that, during an interview with detectives, Sample denied knowing Mayo.[23] Sample's denial of knowing Mayo during the interview was consistent with the act of unfriending the claude.mayo.5 profile from the Solo Haze profile—both were attempts by Sample to separate himself from Mayo.

These circumstances indicate that Sample was not a mere bystander or potential eyewitness to the attempted armed robbery. To the contrary, if believed, the State's argument at the hearing on the motion *in limine* demonstrated that Sample was Mayo's accomplice, and had reason to distance himself from Mayo by unfriending him on Facebook. These circumstances, coupled with the evidence of Sample's and Mayo's ownership of the Facebook profiles, were more than sufficient for a reasonable juror to find

---

[23]Testimony at trial established that the State's argument was correct. According to Detective Childs, phone records indicated that, on December 7, 2015, in the afternoon and early evening, Sample's cell phone and Mayo's cell phone called each other several times. Special Agent Wilde's testimony indicated that, on December 7, 2015, at 5:22 p.m., Sample's cell phone was used to call Mayo's cell phone from the area of Hollins Market. At 6:04 p.m., and at 6:21 p.m., Sample's cell phone was in the area of Towson Wines and Spirits, where the attempted armed robbery occurred around 6:50 p.m. Detective Smith's testimony indicated that a recording from a surveillance camera showed two individuals in the area of Z-Burger, a restaurant in Towson, shortly before the attempted armed robbery. Detective Smith opined that the individuals appeared to be Sample and Mayo. And, days after the attempted armed robbery and Mayo's death, Detective Caskey asked Sample whether he had known Mayo, and he answered in the negative.

that it was more likely than not that Sample was responsible for the unfriending.[24]

This case is comparable to Harris and Monge-Martinez, cases in which this Court held that the State sufficiently authenticated social media evidence. See Sublet, 442 Md. at 678, 113 A.3d at 722. Just as this Court concluded that the content and timing of the Twitter messages in Harris were circumstances from which a trial court could determine that a reasonable juror could have found that the Twitter messages were authored by the defendant, see id. at 674-76, 113 A.3d at 720-21, here, the circumstances that the unfriending occurred the very next day after the attempted armed robbery, that Sample had incentive to distance himself from Mayo, and that circumstantial evidence demonstrated that the SoLo Haze profile belonged to Sample and the claude.mayo.5 profile belonged to Mayo lead to the same conclusion, *i.e.*, a reasonable juror could have found the unfriending was done by Sample. Similarly, just as it was material in Monge-Martinez that the stabbing and the Facebook messages occurred on the same day, at a time when not many people knew of the crime, and that the defendant's name was similar to the "Carlos Monge"

_____

[24]The State's evidence demonstrated that, when the unfriending occurred, Sample was aware of the attempted armed robbery, Mayo's death, and of the potential evidence of his connections to Mayo—in person (at or near the scene of the crime), via cell phone, and on Facebook. The requirement of Maryland Rule 5-901(a) is that, for authentication, evidence must be sufficient to support a finding that the matter in question is what its proponent claims. Maryland Rule 5-901(b) gives, "[b]y way of illustration only, and not by way of limitation," examples of methods of authentication. While the circumstances concerning Sample's knowledge of the attempted armed robbery and Mayo's death, and Sample's connections to Mayo, were not all contained in the Facebook Business Records, they were circumstances argued by the State at the hearing on the motion *in limine* and supported by the evidence. These circumstances, combined with Mayo's and Sample's ownership of the profiles, satisfied the requirement of authentication under Maryland Rule 5-901(a).

- 44 -

Facebook profile name, see id. at 677, 113 A.3d at 721-22, here, it is significant that the unfriending occurred the very next day after the attempted armed robbery, and that Sample's name is similar to the SoLo Haze Facebook profile name and the "mrsample2015@gmail.com" e-mail address associated with the profile. Moreover, as in Monge-Martinez, in this case, the action that Sample allegedly took on Facebook— unfriending the claude.mayo.5 profile—was indicative of consciousness of guilt, which constituted circumstantial evidence that he was the one who used the Facebook profile at issue. See id. at 652-53, 113 A.3d at 707.

Just as the circumstances of this case are similar to those of Harris and Monge-Martinez, they are distinguishable from Sublet, id. at 678, 113 A.3d at 722, a case in which this Court held that the defendant failed to sufficiently authenticate social media evidence. Here, in contrast to Sublet, 442 Md. at 672, 113 A.3d at 719, there is no evidence that Sample ever gave the SoLo Haze Facebook profile's password and username to others. We are aware that Sample contends that, because someone accessed the claude.mayo.5 Facebook profile after Mayo's death and posted information about the death, someone other than him may have accessed the SoLo Haze Facebook profile and unfriended Mayo. But, as the State contends, this is speculation not grounded in evidence. Put simply, there is no evidence that anyone other than Sample ever had access to the SoLo Haze profile, much less that someone other than him used that profile to unfriend the claude.mayo.5 profile.

Requiring the State to somehow conclusively disprove that someone other than Sample was responsible for the unfriending would establish too high a standard for

authenticating social media evidence. The State was not required to eliminate all possibilities that were inconsistent with authenticity, or prove beyond any question that Sample was the one who used the SoLo Haze Facebook profile to unfriend the claude.mayo.5 Facebook profile. See Sublet, 442 Md. at 666, 113 A.3d at 715. Instead, the State needed to prove only that there was sufficient evidence for a reasonable juror to find by a preponderance of evidence, *i.e.*, that it was more likely than not, that Sample was responsible for the unfriending. See id. at 678, 113 A.3d at 722. We conclude that the State met that requirement. As explained above, there was ample circumstantial evidence for the circuit court to conclude that a reasonable juror could find that the SoLo Haze Facebook profile belonged to Sample and that the claude.mayo.5 Facebook profile belonged to Mayo, and that—combined with the circumstances surrounding the unfriending—was sufficient for the circuit court to allow the social media evidence to be presented to the jury.

For the above reasons, the circuit court did not abuse its discretion in admitting the Facebook-related evidence. We reverse and remand to the Court of Special Appeals for that Court to address the other issues raised by Sample on appeal. See Sample, 2019 WL 3451812, at *1, *5 n.1.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT WITH INSTRUCTION TO ADDRESS THE REMAINING ISSUES THAT RESPONDENT RAISED ON APPEAL. RESPONDENT TO PAY COSTS.**

- 46 -

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/54a19cn.pdf