*Sykes v. State*, No. 2132, September Term, 2019. Opinion by Ripken, J.

**CRIMINAL LAW – AUTHENTICATION AND FOUNDATION – TEXT MESSAGES**

Electronic evidence is authenticated using the reasonable juror standard, meaning that, for a trial court to admit electronic evidence, there must be sufficient evidence for a reasonable juror to find by preponderance of the evidence that the electronic evidence is what the proponent claims.

**CRIMINAL LAW – AUTHENTICATION AND FOUNDATION – TEXT MESSAGES**

The State produced sufficient evidence to authenticate text messages where the text messages were extracted from a phone that was taken from the defendant at the time of arrest, defendant was observed unlocking the phone and placing a phone call, and contents of recent messages referred to controlled dangerous substances, a high quantity of which were recovered in the traffic stop that lead to defendant's arrest.

**CRIMINAL LAW – HEARSAY – VERBAL ACTS**

Text messages requesting to purchase drugs are verbal parts of an act, similar to a phone call requesting to purchase drugs discussed in *Garner v. State*, 414 Md. 372 (2010), which may be admitted without violating the Rules Against Hearsay because the offer to purchase has independent legal significance.

**CRIMINAL LAW – HEARSAY – STATEMENTS NOT OFFERED FOR THEIR TRUTH**

A statement will not violate the hearsay rule where the very making of the statement, instead of the truth or falsity of the contents, is the fact at issue. Where a fact asserted or implied in a statement need not be sincerely and accurately stated in order for the out of court statement to help prove what it is offered to prove, it is not in violation of the Rules Against Hearsay.

Circuit Court for Talbot County
Case No. C-20-CR-16-000093

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2132

September Term, 2019
_____

BRANDON SYKES

v.

STATE OF MARYLAND
_____

Berger,
Wells,
Ripken,

JJ.
_____

Opinion by Ripken, J.
_____

Filed: November 18, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

* Kehoe, Christopher B., J., did not participate in
the Court's decision to designate this opinion for
publication pursuant to Md. Rule 8-605.1.

Brandon Sykes ("Sykes") and Jessica Feldmeier ("Feldmeier") were arrested after police discovered packages of controlled dangerous substances ("CDS"), heroin and fentanyl, tucked between the driver and passenger seat of Feldmeier's car. Neither Feldmeier, the driver, nor Sykes, the passenger, claimed ownership of the drugs at the scene. During Sykes's arrest, police officers observed Sykes using a cell phone, which police later determined to have sent and received text messages concerning the sale of narcotics in the ten days prior to the arrest. At Sykes's trial and over his objection, the State introduced those text messages into evidence and called an expert in narcotics investigations to testify about the consistency of the messages and other evidence with patterns of drug distribution. A Talbot County jury convicted Sykes of possession of CDS with intent to distribute.

Sykes now appeals his conviction. According to Sykes, the court erred in admitting numerous text messages and in admitting the expert testimony. Sykes contends that the text messages and the expert testimony were crucial to the State proving his intent to distribute. We hold that the drug-related texts were not admitted in error, and the court acted within its discretion in admitting the expert testimony. We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 6, 2016, Officer Westerfield was patrolling in Easton, Talbot County, Maryland. He observed that a white 2007 Ford Crown Victoria had a malfunctioning rear light rendering the license plate illegible. At approximately 9:24 p.m., Officer Westerfield activated his emergency lights and pulled over the Crown Victoria. He observed Feldmeier in the driver's seat and Sykes in the front passenger seat. The officer explained the reason

for the stop and asked for Feldmeier's license and registration. According to Officer Westerfield, Feldmeier's hands were visibly shaking and there was a shake in her voice. He subsequently asked for Sykes's identification. After returning to his patrol car, Officer Westerfield requested a K9[1] team to assist on the scene.

Officer Tindall responded with his K9, Meiko, and informed Feldmeier and Sykes that he was going to conduct a K9 scan of the vehicle. Meiko alerted[2] at the driver's door, giving a signal indicating the presence of narcotics. Officer Westerfield called for additional backup and searched the vehicle.

Officer Chinn[3] arrived on scene and stood with Sykes and Feldmeier while the vehicle was searched. Officer Westerfield discovered a plastic bag containing 84 packets of suspected narcotics.[4] The larger bag contained 73 multicolored paper folds with a tan powdery material as well as 11 plastic baggies with a rock-like substance. He located the bag in between the passenger seat and either the center console or the gap between the

---

[1] K9 here refers to a police dog specially trained to assist law enforcement.

[2] Officer Tindall started Meiko at the front center of the vehicle and gave Meiko the command to begin searching for narcotics. Meiko walked from the front license plate, around the driver's front headlight, and towards the driver's side door. Once Meiko arrived at the driver's side door, he sat down, giving a positive signal "alerting" that narcotics were present.

[3] We note that the transcript revealed conflicting spellings of Officer Chinn's name. We will use "Chinn," which is the spelling the court reporter used during Officer Chinn's direct examination.

[4] In the Maryland State Police request for laboratory examination of the CDS seized, the description of the drugs initially stated that 83 plastic baggies were found. That form was later corrected to reflect that there were 84 packages seized.

passenger seat and the driver's seat, within reach of both seats. A field test of the substance returned a positive result for heroin. He informed Officer Chinn, who placed Sykes and Feldmeier under arrest.

Officer Chinn escorted Sykes to the patrol car and placed him in the back seat. While Sykes was in the back seat, Officer Chinn observed him remove a Samsung smart phone from his pocket, unlock it, place a call, and talk on the phone. Officer Chinn radioed Officer Westerfield, who approached and observed Sykes on the phone. Officer Westerfield seized the cell phone from Sykes. The officers also seized a cell phone from Feldmeier. Sykes and Feldmeier were both charged with possession of a CDS and possession of a CDS with intent to distribute. Each was within close proximity to the drugs but neither claimed possession at that time.[5]

The seized drugs were sent to the Maryland State Police Forensics Sciences Division for testing. The multicolored paper folds contained a mixture of heroin and fentanyl. The individual plastic baggies contained heroin.

The officers also applied for and obtained a search warrant for the cell phone that was taken from Sykes. Investigators downloaded the emails, text messages, social media conversations, and other data stored on the cell phone into an extraction report. The earliest extracted text messages dated back to 2012. The State created a printout with 691 text

---

[5] In a notarized statement to police, Feldmeier eventually claimed that the drugs were hers, for her personal use, and that Sykes was not aware they were in the car. The statement was admitted by stipulation. Sykes and Feldmeier were tried separately, and Feldmeier pled guilty.

messages sent or received in the ten days prior to Sykes's arrest—between June 27, 2016 and July 6, 2016.

Sykes filed a motion *in limine* to exclude the data extracted from the cell phone arguing that the State failed to demonstrate authenticity, the text messages contained hearsay, and the text messages were irrelevant and prejudicial. At the initial pre-trial motions hearing, the court addressed the issue of authenticity in terms of the chain of custody of the cell phone and text messages. The court found that there was a sufficient foundation to conclude that the text messages extracted were from the cell phone that was taken from Sykes at the time of arrest. As to the defense's authenticity argument, the court denied the initial motion to exclude on that ground. However, the court reserved ruling on the hearsay, relevancy, and prejudice arguments.

Sykes later renewed the motion *in limine* presenting the same grounds as before, including authenticity. At the hearing addressing the motion *in limine*, Sykes's defense counsel again argued that the State should not be permitted to introduce the text messages at trial because the State did not establish Sykes's ownership of the phone or that he was the person making and receiving the text messages. Sykes's defense counsel further reiterated that the text messages were hearsay. The State argued that the phone was authenticated because it had been taken from Sykes's person, numerous email accounts accessed on the phone contained the name Brandon Sykes, and the officers on the scene who seized the phone as well as the officer who conducted the extraction of the text messages were available witnesses for the State. The State also argued that the text

4

messages fell under numerous hearsay exceptions. The court denied the defense's motion to exclude the text messages.

Sykes's trial was held in February of 2018. The State called Officers Westerfield, Tindall, and Chinn to testify regarding the events leading up to and including Sykes's arrest. The parties stipulated that the text messages listed in the State's printout came from the phone that was seized from Sykes. The State moved to admit the full printout into evidence, and Sykes renewed his objection. The court noted the objection and admitted the printout. The State also called Sergeant Crouch, who was offered as an expert in field drug investigations and interdictions with expertise in drug paraphernalia, sales, and terminology.

The defense objected to Sergeant Crouch's testimony, arguing that the State had not disclosed the substance of Sergeant Crouch's findings and opinions or the summary of the grounds for those opinions in violation of Rule 4-263(8)(a). The State responded that it had sent a formal expert notification to the defense in July of the previous year. In the notification, the State named Sergeant Crouch and indicated that he was being offered as an expert in packaging, sales, street value, and narcotics terminology, and that he would testify as such. The State also specified that Sergeant Crouch would offer opinions as to whether the factual circumstances surrounding Sykes's arrest were indicative of personal use or distribution. Such opinions would be based, according to the State, on what he learned in court. The court overruled the defense's objection and accepted Sergeant Crouch as an expert in the field of drug investigations and interdiction.

Sergeant Crouch testified regarding numerous text messages, both incoming and outgoing, and gave his opinion that the contents of these messages were consistent with distribution. He also testified that the amount of drugs—the 84 packages of heroin and fentanyl—found in Feldmeier's car was consistent with quantities used for distribution.

After the State rested its case, the defense did not call any witnesses. The jury found Sykes guilty of possession of a CDS with the intent to distribute. Sykes was sentenced to 18 years of imprisonment. This timely appeal followed.[6]

Additional facts will be included as they become relevant to the issues.

### ISSUES PRESENTED FOR REVIEW

Sykes presents two issues for review:[7]

I. Did the circuit court err in admitting the text messages extracted from the cell phone taken from Sykes's person at the time of arrest?

II. Did the circuit court err in allowing Sergeant Crouch to testify as an expert?

For the reasons discussed below, we hold that there was no error as to admission of the drug-related text messages, and no error as to admission of Sergeant Crouch's expert testimony interpreting such texts. We note that although there was error in the admission

---

[6] After the close of evidence and during jury deliberations, Sykes absconded. The trial judge found that he had voluntarily absented himself and allowed the jury to return its verdict. Sykes was apprehended eighteen months later in late 2019. His sentencing hearing was held in December of 2019.

[7] Rephrased from:
  I. Did the lower court err in admitting unfairly prejudicial hearsay?
  II. Did the lower court err in allowing expert opinion testimony that the state failed to disclose before trial?

of the non-drug-related text messages, that error was harmless beyond a reasonable doubt. We shall affirm.

## DISCUSSION

**I.    THE COURT DID NOT ERR IN ADMITTING THE DRUG-RELATED TEXT MESSAGES EXTRACTED FROM THE CELL PHONE.**

Sykes contends that the circuit court erred in admitting the text messages in three respects: first, the phone and outgoing messages were not authenticated; second, the contents of the incoming and outgoing text messages were inadmissible hearsay; and third, the text messages were irrelevant and highly prejudicial. The State responds that the text messages were properly admitted. We address each of Sykes's contentions regarding the text messages. We begin with his authenticity claims, and then turn to his claims regarding relevancy, and last, we reach hearsay. Because we ultimately hold that any error in admitting the non-drug-related text messages was harmless, we focus our hearsay analysis on the drug-related text messages.

When an appellant claims evidence was erroneously admitted based on lack of authenticity, we review the trial court's decision for abuse of discretion. *Darling v. State*, 232 Md. App. 430, 456 (2017). We review a trial court's determination as to the relevance of evidence *de novo*, and its determination whether to admit or exclude relevant evidence for an abuse of discretion. *State v. Simms*, 420 Md. 705, 725 (2011). "Whether evidence is hearsay is an issue of law reviewed de novo," but whether a trial court properly admitted hearsay under an exception is reviewed for "abuse of discretion or clear error if it involves

7

factual or discretionary determinations." *Colkley v. State*, No. 833, Sept. Term 2019, slip op. at 43 (Md. Ct. Spec. App. July 2, 2021).

### A. The Outgoing Text Messages Were Properly Authenticated.

Pursuant to Maryland Rule 5-901(a), authentication of evidence, including electronically stored evidence, is a condition precedent to its admissibility, and the condition is satisfied where there is sufficient evidence "to support a finding that the matter in question is what its proponent claims." Md. Rule 5-901(a). "[T]he burden of proof for authentication is slight, and the court need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately might do so." *Darling*, 232 Md. App. at 455 (alteration in original) (quoting *Johnson v. State*, 228 Md. App. 27, 59 (2016)). For electronic evidence, we utilize the "reasonable juror" test, and ask whether a reasonable juror might find more likely than not that the evidence is what it purports to be. *State v. Sample*, 468 Md. 560, 597, 599 n.20 (2020). The standard, then, is by a preponderance of the evidence. *Id.*

Rule 5-901(b) sets forth a non-exhaustive list of the manners in which evidence may be authenticated. Relevant here, evidence may be authenticated directly, through testimony of a witness "with knowledge that the offered evidence is what it is claimed to be," or circumstantially, "such as [through] appearance, contents, substance, internal patterns, location, or other distinctive characteristics[.]" Md. Rule 5-901(b)(1), (4).

This Court addressed authentication of text messages in *Dickens v. State*, 175 Md. App. 231 (2007). There, Dickens was convicted of first-degree murder for the fatal shooting of his wife. *Id.* at 234. After the shooting, Dickens went to a neighbor's house and

8

reported that he had "done something to his girlfriend," prompting the neighbor to call the police. *Id.* at 235. At Dickens's trial, the State introduced as evidence threatening text messages sent by him to his wife in the two and a half months leading up to the shooting. *Id*. at 236–37. The text messages were sent from a phone that Dickens possessed prior to the shooting. *Id.* at 238. On appeal, Dickens argued that the text messages were inadmissible as not having been authenticated by the State, and the circuit court erred in ruling otherwise. *Id.* at 237.

We held that direct and circumstantial evidence linked the phone, and the messages sent from the phone, to Dickens. *Id.* at 240. As to the direct evidence connecting Dickens to the phone, the victim's mother testified that she had given the victim a new phone in the months prior to the shooting, and the victim gave Dickens her old phone. *Id.* at 237–38. She confirmed that the cell phone number from which certain threatening messages were sent matched the number of the victim's old phone. *Id.* at 238. Her testimony was corroborated by the fact that the phone was recovered near the neighbor's home where Dickens was arrested. *Id.* In regard to the circumstantial evidence, we concluded that the content of the messages—referencing custody of their daughter and wedding vows ("until death do us part")—and the context in which they were sent—contemporaneously with Dickens telling people he would find the victim and "deal with [her]"—also demonstrated authenticity. *Id.* at 238–40. Last, we looked at the text messages in the context of "what [Dickens] did later," i.e., "shot his wife." *Id*. at 238–39. We thus held the trial court did not err in ruling the text messages were authenticated based on the collective circumstances. *Id.* at 240.

The collective circumstances in the present case likewise demonstrate that the cell phone belonged to Sykes. The State introduced direct evidence that the phone belonged to Sykes through the testimony of two witnesses. At trial, both Officer Westerfield and Officer Chinn testified to seeing Sykes use the cell phone at the time of arrest. Officer Chinn further testified that he saw Sykes take the phone from his pocket, unlock it, and place a phone call. Such possession and use are consistent with ownership. The officers' testimony provided sufficient evidence for the circuit court to conclude that a reasonable juror could find that the phone was what the State purported it to be—a cell phone belonging to Sykes.[8]

Additionally, a reasonable juror could find it more likely than not that the outgoing text messages extracted from that cell phone were sent by Sykes. In *State v. Sample*, Sample was arrested following an attempted armed robbery where his accomplice, Mayo, was fatally shot. 468 Md. at 565. The State introduced evidence at trial of two Facebook profiles that the State claimed belonged to Sample and Mayo. *Id.* at 581–82. Critically, the State provided evidence that the profile associated with Sample unfriended the profile associated

---

[8] At the motions hearing on the admission of the cell phone, Corporal Wells testified that he was given the phone from the Easton Police Department because the department could not access the information on the phone as it had a passcode. The State also argued at a later hearing that the extracted data indicated numerous email addresses associated with "Brandon Sykes," had been accessed on the phone and older outgoing messages identified the user as "Brandon." Sykes countered that the extracted data also showed that the phone received email intended for Feldmeier. The State further argued that Feldmeier was listed as a contact in the phone's address book with the name "Baby," and that the phone sent messages to Feldmeier's phone contemporaneous with outgoing drug-related messages. This evidence was not discussed before the jury or admitted at trial. While that information was not presented to the jury, it was argued by the State at the pretrial hearing on this issue and the information referenced does not appear to be contested by Sykes.

with Mayo shortly after the attempted robbery. *Id.* at 582. Following his conviction, Sample appealed. *Id.* at 585–87.

In addressing Sample's claim of error, the Court of Appeals applied the reasonable juror test to authentication of the Facebook profile associated with Sample and the action taken by that Facebook profile—unfriending Mayo's profile. *Id.* at 597. The Court concluded that, based on the name of the Facebook profile, the email address associated with the account, the current city listed for the profile, and the "connections" for the profile, sufficient distinctive characteristics existed for a reasonable juror to conclude that the profile belonged to Sample. *Id.* at 599–600. Turning to the "unfriending" action taken by Sample's profile, the Court likewise concluded that a reasonable juror could find that Sample used the profile to unfriend Mayo's profile. *Id.* at 602. The Court reasoned that "[i]n and of itself, the ample evidence that the [Sample] profile belonged to Sample constitutes strong evidence that he was responsible for the unfriending." *Id.* In addition, the evidence adduced at trial indicating that Sample was the surviving attempted robber supported the conclusion that Sample was responsible for unfriending the Mayo profile because it showed he had a motive to "sever ties" with Mayo. *Id.* The Court concluded that the evidence of Sample's ownership of the profile as well as the collective circumstances provided sufficient evidence for a juror to conclude that Sample was responsible for the actions taken from the Sample profile. *Id.* at 603.

Here, the evidence that the phone belonged to Sykes "in and of itself" constituted strong evidence that he authored the outgoing text messages. In looking to the circumstances surrounding the text messages, we note that the drug-related text messages

11

took place within ten days of Sykes's arrest. In addition, the only other person in the car, Feldmeier, also had a cell phone that was seized from her person.

The content of the drug-related text messages was also consistent with the evidence of Sykes's arrest with a large quantity of heroin. The State provided an expert witness who testified that the terminology used in the text messages was consistent with heroin transactions. And, the most recent incoming text message discussing drug transactions was received the day before Sykes's arrest and is marked: "Read." Thus, the collective circumstances, coupled with the evidence of Sykes's ownership of the cell phone, lends support to the circuit court's conclusion that a juror could find more likely than not that Sykes authored the text messages.

Sykes presents a number of arguments that the evidence presented was insufficient to authenticate the outgoing messages. He first argues that no testimony from a witness with personal knowledge was presented, as none of the text messages that were offered at trial were alleged to have been sent in the officers' presence. However, personal knowledge is just one method by which evidence may be authenticated pursuant to Maryland Rule 5-901. Sykes also maintains that the State failed to exclude the possibility that the phone belonged to someone else, for example by obtaining records of the account holder. Such contentions are also without merit, as they go to the weight, not the admissibility, of the evidence. For admissibility purposes, the State is not required to disprove all other possibilities, nor is it required to prove authenticity with absolute certainty. *See Sample*, 468 Md. at 605 ("The State was not required to eliminate all possibilities that were inconsistent with authenticity, or prove beyond any question" that the defendant was the

one who used the communication device). Rather, it need prove "only that there was sufficient evidence for a reasonable juror to find by preponderance of evidence" that Sykes was responsible for the text messages. *See id.* Sykes's control and possession over the phone permitted the jury to conclude that he authored the recently composed text messages. We conclude there was sufficient evidence to find that the State met its burden.

On appeal, Sykes urges this Court to find persuasive and thus follow the reasoning and holding of *Commonwealth v. Mosley*, 114 A.3d 1072 (Pa. Super. Ct. 2015). There, a defendant was arrested for possession of a controlled dangerous substance, and officers recovered two cell phones from his person following a search incident to arrest. *Id.* at 1076–77. A search of the phones revealed numerous drug-related text messages. *Id.* at 1077. Before trial, Mosley filed a motion to suppress the text messages arguing that they were not properly authenticated as having been authored by him. *Id.* The trial court denied the motion, and several text messages both drug-related and non-drug-related were admitted at trial. *Id.*

On appeal, Mosley renewed his arguments surrounding authenticity of the text messages, and the Pennsylvania Superior Court held that the text messages were admitted in error. *Id.* at 1078, 1084. The court noted that Mosley denied ownership of the cell phones taken from his person; no first-hand corroborating testimony was presented regarding authenticity and multiple email addresses were attached to the cell phones, which could indicate that someone else owned or accessed the phones. *Id.* at 1082–83. The court found that "most relevant to the issue of authorship" was that the drug-related text messages did

13

not identify Mosley, despite the fact that previous non-drug-related text messages did

identify Mosley. *Id*. at 1083. The court concluded:

> Bearing in mind the unique nature of a cell phone and its pervasiveness in everyday society, we believe that in order to use content from a cell phone as testimonial evidence in a criminal prosecution, the Commonwealth must clearly prove its authentication. Because there was no evidence, direct or circumstantial, clearly proving that Mosley was the author of the drug-related text messages, or any corroborating witness testimony regarding authenticity of the messages, we find that the trial court erred in determining that the drug-related texts were authenticated properly[.[9]]

*Id.*

The court's holding in *Mosley* has no bearing on our analysis here.[10] The *Mosley*

court notes a higher standard for authentication, that the State must "clearly prove"

---

[9] Interpreting a prior Pennsylvania case, *Commonwealth v. Koch,* 106 A.3d 705 (Pa. 2014), the court determined that ownership or possession of the phone that sent the messages alone is not adequate to authenticate authorship of messages. *Mosley*, 114 A.3d at 1083–84. The *Mosley* court noted that *this case* was "a close case regarding authorship and authentication," but ultimately no evidence was presented "tending to substantiate that Mosley was the author of the drug-related text messages." *Id.* at 1083. Accordingly, the court determined that the evidence relied on by the trial court—that there were similar contacts in both phones, Mosley's mother was listed as a contact in each phone under the name "Momma Dooks," the mother of Mosley's child sent similar text messages on each phone, and prior incoming text messages referring to Mosley by name—did not authenticate Mosley's sending the messages. *Id.* Additionally, one text message sent from Mosley's mother wished him a happy birthday, but did not reference drugs, and another text message corroborated a stamp found on one of the bags of drugs discarded by Mosley. *Id.*

[10] Other out of state cases cited by Sykes are similarly unpersuasive. Sykes cites *State v. Francis*, 455 S.W.3d 56 (Mo. Ct. App. 2014) for the proposition that possession of the phone at the time of arrest is insufficient "by itself" to establish authorship. However, as noted, Sykes's possession of the cell phone at the time of arrest was not the only piece of evidence offered to demonstrate authentication.

authentication[11], *id.* at 1084; whereas Maryland law provides the lesser burden of preponderance of the evidence. *See Sample,* 468 Md. at 597 (holding the standard for authentication of electronic evidence is by a preponderance of the evidence, meaning "more likely than not"); *Darling*, 232 Md. App. at 455 ("[T]he burden of proof for authentication is slight, and the court need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately might do so."). As we discussed, there was sufficient evidence to conclude that a reasonable juror could find, by preponderance of the evidence, that Sykes owned the cell phone. Accordingly, we see no error in the court's determination of authenticity. *Darling*, 232 Md. App. at 456 ("[O]nce a prima facie showing of authenticity is made, the ultimate question of authenticity is left to the jury.").

**B. The Content of the Drug-Related Text Messages Was Relevant, and Their Probative Value Was Not Substantially Outweighed by the Danger of Unfair Prejudice.**

Having determined that the cell phone and text messages found therein were authenticated, we next turn to Sykes's contention that the circuit court erred in admitting the text messages because the texts were irrelevant and unfairly prejudicial. Specifically, he argues that the "marginal relevance to an element of the offense charged" contrasted with the "distinct potential for working unfair prejudice" render the text messages inadmissible. Though Sykes focuses his argument on the drug-related text messages, we

---

[11] The court stated in a footnote that it would "leave for another day the quantum and quality of evidence necessary to 'clearly' prove authentication of text messages." *Mosley*, 114 A.3d at 1084 n.13.

15

recognize that the court admitted a total of 691 text messages, only a fraction of which constitute drug-related texts. Therefore, we first address relevancy as it pertains to both the drug-related and non-drug-related text messages, then balance the relevancy against any prejudicial effect.

### 1. Relevancy determination

As to relevancy, Sykes argues that the text messages discussing drug transactions were irrelevant because they could have been consistent with other drugs that were not heroin, and that the expert testimony interpreting such text messages acknowledged as much. Sykes also posits that the drug-related text messages received closest to the time of arrest were received the day before, and the user of the phone did not respond to those texts. Therefore, Sykes argues, the messages do not demonstrate an intent to distribute.

All relevant evidence is admissible. Md. Rule 5-402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. Here, Sykes was charged with possession of a CDS with intent to distribute. Sergeant Crouch testified that, in his expert opinion, the number of texts from customers soliciting drugs stood out as a significant indicator that the drugs found in Sykes's possession were for commercial use rather than personal use,[12] although he could not say for certain whether the drug transactions were for heroin.

---

[12] For example, Sergeant Crouch testified that the significance of the interaction, "I need five more" (incoming), "give me 15 min" (outgoing), "can u thro in one so I can make something please that's 230 already" (incoming), was a customer soliciting a drug

The drug-related text messages are certainly relevant in that they make it more probable that Sykes both possessed the 84 packages of heroin and intended to distribute them, given the number of text messages purporting to engage in drug transactions. Moreover, whether the text messages are consistent with other drugs, in addition to heroin, does not render the text messages irrelevant, as they still make it more likely that Sykes had the intent to distribute the drugs found in his possession. When viewing the drug-related text messages in context with Sergeant Crouch's testimony interpreting the texts as well as the other evidence presented at trial, it is apparent these messages clear the relevancy threshold for admission. *Williams v. State*, 457 Md. 551, 564 (2018) ("Having 'any tendency' to make 'any fact' more or less probable is a very low bar to meet.").

In contrast, the remaining non-drug-related text messages are not relevant to this case. For example, text messages stated "wyd," and "ok," and others discussed paying bills and running errands. Such texts do not make any fact that is of consequence more or less probable, and we hold that the circuit court erred in admitting these texts.[13] However, we

_____

transaction and asking if the seller would "throw in" an extra package of the controlled dangerous substance so the customer could make money from dealing. He testified that the significance of the incoming text messages stating a number, "I need like two . . . fifty," "75," and "something good for ninety my man . . . ." was the customer requesting two packages of a controlled dangerous substance for $50, $75 worth of the controlled dangerous substance, and $90 worth of the controlled dangerous substance.

[13] We do not foreclose the possibility that non-drug-related text messages may be relevant, particularly where authentication is a fact issue submitted to the jury. Because here, the State did not proffer any relevancy nor did it present these text messages to the jury except in the exhibit as a whole, we see no basis for which we can find the text messages to be relevant.

are satisfied beyond a reasonable doubt that the error was harmless, as the irrelevant texts in no way contributed to the guilty verdict. *See Dove v. State*, 415 Md. 727, 743 (2010) (holding that error is harmless where "there is no reasonable possibility that the evidence complained of . . . may have contributed to the rendition of the guilty verdict"). As such, we continue with our analysis of Sykes's claims of error, focusing our attention on the drug-related text messages.

### 2. *Balancing probative value and prejudicial effect*

Sykes next argues that, if the text messages are relevant, they are highly prejudicial because they invite the jury to make improper inferences based on Sykes's propensity to distribute drugs. Such propensity evidence constitutes "prior bad acts," according to Sykes, and is inadmissible under Maryland Rule 5-404(b). The State responds that any evidence that Sykes was contemporaneously distributing drugs has "special relevance" as to his future intent to distribute the heroin found at the time of his arrest.[14]

Though evidence may be relevant, it nonetheless may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Md. Rule 5-403. However, "[e]vidence is never excluded merely because it is prejudicial." *White v. State*, No. 1232, Sept. Term 2019, slip op. at 34 (Md. Ct. Spec. App. May 26,

---

[14] The State also argues that the "prior bad acts" argument is unpreserved because Sykes did not assert in the proceedings below that the text messages were in violation of Maryland Rule 5-404, only that they were in violation of 5-403. According to the State, he should not be permitted to "repackage that sort of claim in the guise of a Rule 5-403 prejudice argument." As in *Howard v. State*, we analyze the "prior bad acts" argument under the balancing test of probative value and prejudicial effect outlined in Rule 5-403. 324 Md. 505, 513–17 (1991).

2021) (internal quotations omitted) (quoting *Moore v. State*, 84 Md. App. 165, 172 (1990)). Nor is the evidence excluded because the danger of prejudice simply outweighs the probative value; it must, "as expressly directed by Rule 5-403, do so *substantially*." *Montague v. State*, 471 Md. 657, 696 (2020) (emphasis in original) (internal quotation marks omitted) (quoting *Molina v. State*, 244 Md. App. 67, 135 (2019)). "Under some circumstances, where intent is legitimately an issue in the case, and where by reason of similarity of conduct or temporal proximity, or both, evidence of other bad acts may possess a probative value that outweighs the potential for unfair prejudice, the evidence may be admissible." *Howard v. State*, 324 Md. 505, 514 (1991).

The text messages were introduced during Sergeant Crouch's expert testimony interpreting the texts in the context of whether the drugs were for personal or commercial use. The texts, aided by the expert testimony, are probative as to both possession of the heroin and intent to distribute the heroin. *See Smiley v. State*, 138 Md. App. 709, 716 (2001) ("[A]n [i]ntent to distribute controlled dangerous substances is seldom proved directly, but is more often found by drawing inferences from facts proved which reasonably indicate under all the circumstances the existence of the required intent."). Intent is "legitimately an issue" in this case, and Sykes acknowledges as much stating that the text messages were "a key component of the State's case for mens rea."

Moreover, "prejudicial evidence is not excluded under Rule 5-403 only because it hurts one party's case." *Montague*, 471 Md. at 674. Instead, the rule mandates that the prejudice must be "unfair," meaning it "tends to have some adverse effect . . . beyond tending to prove the fact or issue that justified its admission." *Id.* at 688–89 (alteration in

19

original) (quoting *State v. Heath*, 464 Md. 445, 464 (2019)) (holding that admission of defendant's recorded rap lyrics was not unfairly prejudicial as improper propensity evidence where a close nexus existed between the lyrics and the crime charged). Though the text messages describing drug transactions were prejudicial to Sykes, they bore a specific nexus to an element of the charged crime: intent to distribute. As such, admission of the text messages did not have an adverse effect beyond tending to prove the intent element. We are satisfied that the probative value is not substantially outweighed by the danger of prejudice, and we hold that the circuit court did not err in admitting the drug-related text messages.

### C. The Drug-Related Text Messages Did Not Constitute Inadmissible Hearsay.

Having determined that there was sufficient evidence that the cell phone and drug-related text messages found therein were authenticated and there was no error regarding relevancy nor unfair prejudice, we next turn to whether the text messages constituted hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801. "There are two threshold questions when a hearsay objection is raised: (1) whether the declaration at issue is a 'statement,' and (2) whether it is offered for the truth of the matter asserted." *State v. Young*, 462 Md. 159, 170 (2018) (internal quotation marks omitted) (quoting *Stoddard v. State*, 389 Md. 681, 688–89 (2005)). A statement is not inadmissible hearsay where it is offered "not to establish the truth of the matter asserted therein, but simply to establish that the statement was made[.]" *Id.* (alteration in original) (quoting *Lunsford v. Bd. of Educ. of Prince George's Cnty.*, 280 Md. 665, 670 (1977)).

20

This inquiry depends on whether "the fact asserted in the out of court statement [must be] sincerely and accurately stated[] in order for the out-of-court statement to help prove what it is offered to prove[.]" *Id.* (alterations in original) (quoting Lynn McLain, Maryland Evidence, State & Federal (3d ed. 2013)).

The parties do not contest that the text messages are statements; rather, they disagree as to whether the text messages were offered for the truth of the matter asserted, and if so, whether they fit within a hearsay exception. Sykes maintains that the text messages constituted inadmissible hearsay. According to Sykes, the text messages were offered for the truth of either the explicit statements or the implied assertions therein, and they do not fit within any hearsay exception. The State advances a number of arguments for the admissibility of the text messages. Although the drug-related text messages varied in form and substance, we shall analyze them in two categories.

### 1. Text messages constituting verbal parts of an act

The first category consists of incoming texts requesting a specified amount of drugs and any outgoing texts responding to that request. For example, incoming messages were received stating: "I need 5 more," "Can u thro 1 in so I can make something please that's 230 already," and "I need like 2 . . . .50," as well as outgoing messages stating: "This B ock bring me another 8th." In determining whether the content of these text messages constitutes hearsay, *Garner v.* State, 414 Md. 372 (2010), is controlling.

In *Garner*, the Court of Appeals addressed whether statements made over the phone in an attempt to buy drugs constituted inadmissible hearsay. *Id.* at 374. There, an officer seized a phone from Garner following his arrest, and a search of his vehicle revealed

21

thirteen baggies of cocaine. *Id.* at 375. The phone rang while in the officer's possession, and the officer picked up the phone and heard a voice on the other line say: "can I get a 40?" *Id.* at 376. The unidentified person hung up after the officer asked his name. *Id.*

Garner was charged with possession of a CDS with intent to distribute. The State relied in part on the unknown caller's statement to characterize Garner's possession as commercial rather than personal. *Id.* Garner objected to the statement being admitted through testimony of the officer. *Id.* at 376–77. Garner argued the statement constituted inadmissible hearsay. *Id.* at 377. The court overruled his objection and permitted the State to introduce the content of the phone call. *Id.* On appeal, Garner argued such ruling was in error. *Id.* at 381.

The Court of Appeals upheld the circuit court's ruling that the testimony describing the phone call did not violate the rule against hearsay. *Id.* at 382. In comparing drug-transaction cases with illegal betting cases, the Court stated that "[w]hen a telephone is used to receive illegal wagers or to receive orders called in by persons who wish to purchase a controlled dangerous substance, the telephone becomes an instrumentality of the crime." *Id.* The purchase of illegal drugs is a form of a contract, where there is offer and acceptance, so the "telephoned words of the . . . would-be-purchaser are frequently categorized, therefore, as verbal parts of acts. They are not considered to be assertions and do not fall under the scrutiny of the Rules Against Hearsay."[15] *Id.* (quoting *Garner v. State*, 183 Md.

---

[15] The Court noted that there is "an unbroken line of state and federal appellate decisions" that hold telephone calls such as the one at issue in *Garner* are admissible. *Garner*, 414 Md. at 384.

App. 122, 140 (2008)). This conclusion is due to the phone call having been an "action seeking to achieve [certain] ends, and the performative quality of such behavior justifies non-hearsay treatment when it is proved as a means of showing that bets are taken or drugs are sold where the call is received." *Id.* at 385.

The Court also rejected Garner's argument that the statement must be excluded because it contained an implied assertion.[16] *Id.* at 381–82, 388. In doing so, it reasoned that "the only assertion implied in the anonymous caller's question was the assertion that the caller had the funds to purchase the drugs that he wanted to purchase." *Id.* at 388. The Court thus held that "the rule against hearsay does not operate to exclude evidence of the 'verbal act' that established a consequential fact: Petitioner was in possession of a telephone called by a person who requested to purchase cocaine." *Id.* at 388.

For the same reasons the Court held the telephoned statement in *Garner* did not constitute inadmissible hearsay evidence, the text messages here do not violate the hearsay rule. The drug-related text messages constituted verbal parts of a drug transaction, with the cell phone being an instrumentality of the crime. The text messages were offered not to prove that the specific drug transactions in the texts occurred, as Sykes posits, but rather that Sykes was in possession of the cell phone which numerous persons frequently texted in attempts to purchase drugs, and from which responsive texts emanated. The text messages had legal significance, to prove that drug transactions were discussed whether or

---

[16] The Court of Appeals later clarified in *State v. Young*, 462 Md. at 175, that *Garner* demonstrated that a legally operative verbal act may be admissible as non-hearsay even if it contains an implied assertion.

not the offers were accurate or genuine. As in *Garner*, these text messages constitute verbal acts, and the "performative quality" of these acts justifies non-hearsay treatment because the texts were admissible to show that drugs were sold as a result of the text being received.

2. *Text Messages not offered for the truth of the matter asserted that do not constitute verbal acts*

While some text messages indicate simple offers to purchase, a number of the text messages discussing drugs do not appear to be engaging in transactions, and as Sykes argues, do not constitute verbal acts. In his reply brief, Sykes identifies specific incoming messages that he contends are not verbal acts and could only have been offered to prove that Sykes distributed drugs to the message-sender on a prior occasion. For example, Sykes posits that an incoming text stating "I opened the first 1 and it was small when I opened the second 1 it made up for it," does not denote contractual bargaining, but is offered to communicate that a drug transaction occurred where one package was light in weight and the second package compensated for the first.

A statement will not violate the hearsay rule where the very making of the statement, instead of the truth or falsity of the contents, is the fact at issue. *Young*, 462 Md. at 170. "This depends on whether the fact asserted in the out-of-court statement [must be] sincerely and accurately stated[] in order for the out-of-court statement to help to prove what it is offered to prove[.]" *Id.* This analysis applies to both intentional assertions, where a statement is being offered for its literal truth, and implied assertions, where the statement is being offered for some implicit truth. *Id.* at 170–71.

24

In *State v. Young*, the Court of Appeals discussed the jurisprudence of "implied assertions." *Id.* at 170–77. After being charged with illegal possession of a controlled dangerous substance, Young sought to introduce evidence of his prescription to demonstrate that his possession was not illegal. *Id.* at 164. The State objected on hearsay grounds, arguing that the prescription was offered for the truth of the implied assertions that Young validly held the prescription or for the implicit fact that the prescription was valid. *Id.* at 164–65.

The Court in *Young* examined the seminal Maryland case addressing the implied assertions doctrine: *Stoddard v. State*, 389 Md. 681 (2005). *Id.* at 171–74. In *Stoddard*, the Court held that the doctrine "excludes such evidence as hearsay 'where a declarant's out-of-court words imply a belief in the truth of X, … [and are] offered to prove that X is true.'" *Young*, 462 Md. at 172 (alterations in original) (quoting *Stoddard*, 389 Md. at 692). There, the State sought introduction of a child's statement asking "is [Stoddard] going to get me," as evidence that the child witnessed Stoddard commit a murder. *Stoddard*, 389 Md. at 687. The Court of Appeals held that "where the probative value of words, as offered, depends on the declarant having communicated a factual proposition[], the words constitute an 'assertion' of that proposition," and are offered for their truth. *Id.* at 703. Though the statement was not being offered for its literal truth, it nonetheless was hearsay because it was offered for the truth of the implied factual proposition that the child witnessed the murder. *Id.* at 711.

The *Young* Court noted that in subsequent cases following *Stoddard*, the Court had "consistently resisted an overbroad interpretation of [Stoddard's] holding." *Young*, 462

25

Md. at 173. In *Bernadyn v. State*, the Court upheld the trial court's exclusion of a medical bill as hearsay based on the State's proffered use. 390 Md. 1, 3 (2005). Because the State argued that the bill demonstrated that Bernadyn lived at the house, "the bill was an implied assertion offered for the truth of the statement that the doctor's office who sent the bill was asserting that Bernadyn lived at the address." *Young*, 462 Md. at 174. The *Young* Court highlighted that *Bernadyn* suggested "an alternate theory favoring admission—offering the statement as merely probative circumstantial evidence." *Id.* at 174

Finally, in *Garner*, the Court of Appeals "pick[ed] up directly where *Bernadyn* left off" and declined to exclude a statement as hearsay where the statement was "circumstantial evidence probative of a fact that does not rely on the declarant's implied assertion[.]" *Id.* Based on these cases, the *Young* Court determined that the prescriptions were not offered for the truth that Young held a valid prescription, but were offered to prove "the operative fact of the prescription's existence." *Id.* at 179. Whether the prescription was from an authorized provider was a question of fact for the jury. *Id.* at 178–79.

Turning back to the instant case, the drug-related text messages here—those not falling within the verbal acts doctrine—do not depend on the truth of any implied factual proposition of the declarant. Rather, they were offered as "probative circumstantial" evidence. Taking Sykes's example, the text message discussing the weight of the two packages was not offered to prove that Sykes sold two packages of controlled substances, where one package compensated for the other, but was offered to prove the very fact that

the statement was made.[17] At the pre-trial motions hearing, the State indicated that it would be introducing those drug-related text messages through Sergeant Crouch's testimony to explain why those conversations are drug related. According to the State's proffered use, the declarant's belief in the truth of the statements is irrelevant, and whether any implied assertion was "sincerely and accurately stated" has no bearing on the purpose for which they were introduced: to demonstrate that the phone in Sykes's possession engaged in drug-related conversations. We therefore hold that these drug-related text messages were not offered for the truth of the assertions, whether explicit or implicit, and therefore constitute non-hearsay.[18]

---

[17] Other drug-related text messages are consistent with this analysis: "Man' . . . . I sniff. This is like . . . Play doe. There's other things to use for weight Rather thebn[sic] water," "It was alright not worth 275," and "It's not about a rating . . . Want to tell you about something else but 8 as far as that goes."

[18] It is apparent to us that the trial court thought all the text messages were hearsay. To be sure, the court stated on numerous occasions the text messages were "clearly hearsay," but admitted the text messages as falling under multiple hearsay exceptions including present sense impressions, then-existing mental condition of the individuals, evidence of a regularly conducted business activity, statement by party opponent, and statements against interest. At trial, the State also appeared to concede that the text messages constitute hearsay, but argued they were nonetheless admissible.

Because we hold that the drug-related text messages are not hearsay, we do not address the exceptions relied upon by the trial court and the State for those particular text messages. *See Unger v. State*, 427 Md. 383, 406 (2012) (holding an appellate court will affirm a trial court's judgment on any ground adequately supported by the record, "whether or not that ground was relied upon or even considered by the court below," so long as that ground is legally correct) (quoting *United States v. Arthur Young*, 465 U.S. 805, 814 n.12 (1984); *Gordon v. State*, 431 Md. 527, 538 (2013) ("[T]he trial court's ultimate determination of whether particular evidence is hearsay or whether it is admissible under a hearsay exception is owed no deference on appeal, but the factual findings underpinning this legal conclusion necessitate a more deferential standard of review.").

**II.** **THE COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING SERGEANT CROUCH TO RENDER EXPERT TESTIMONY.**

Sykes relatedly contends that the circuit court erred in allowing Sergeant Crouch to render expert testimony as to the significance of the text messages and the factual circumstances surrounding Sykes's arrest because the State failed to comply with the applicable discovery rules. According to Sykes, though the State sent the expert notification identifying Sergeant Crouch in July of 2017, the notification was deficient in failing to identify the substance of Sergeant Crouch's testimony. Because of this omission, Sykes maintains, he did not have the opportunity to investigate the appropriateness of the testimony on the subject. The State responds that the expert notification complied with Maryland Rule 4-263. Alternatively, even if it did not comply with the discovery rule, the State argues that it was within the trial court's discretion whether to exclude the testimony.

We initially note that the expert notification that is at issue is not found within the record. Though Sykes and the State pursue competing claims as to whether the notification was deficient, they seem to agree as to the contents. To be sure, both parties state that the notification was sent in June of 2017, and it indicated that Sergeant Crouch was to be offered as an expert in drug forensics and "[m]ay testify about the packaging, sales, [and] street value of controlled dangerous substance as well as offering [an] opinion as to whether the factual circumstances presented are consistent with personal use of distribution." The parties also agree that, in response to Sykes's initial contention that the disclosure was inadequate, the State informed Sykes that Sergeant Crouch "would not be rendering any opinions until he was within court." Keeping this in mind, we turn to the discovery rules.

28

Discovery rules exist in the criminal context for the purpose of assisting a defendant in preparing a defense and protecting a defendant from surprise. *Thomas v. State*, 397 Md. 557, 567 (2007). The relevant portion of Maryland Rule 4-263 provides that, for each expert consulted by the State in connection with the action, the State shall provide to the defense:

>  (A) The expert's name and address, the subject matter of the consultation, the substance of the expert's findings and opinions, and a summary of the grounds for each opinion;
>  (B) The opportunity to inspect and copy all written reports or statements made in connection with the action by the expert, including the results of any physical or mental examination, scientific test, experiment, or comparison; and
>  (C) The substance of any oral report and conclusion by the expert;

Md. Rule 4-263(d)(8).[19] The failure of a party to comply with Rule 4-263 "does not automatically disqualify a witness from testifying," as disqualification is within the court's discretion. Md. Rule 4-623(n).

The State argues that the expert notification complied with the requirements of Rule 4-263; however, as we noted, the record does not contain the expert notification. In the absence of the precise contents of the notification, we decline to speculate as to whether the contents meet the rule's requirements. Rather, we proceed to consider, based on the facts before us, whether the trial court abused its discretion in declining to exclude Sergeant Crouch's testimony. This Court has stated that in exercising such discretion, the circuit court is to consider "(1) the reasons why the disclosure was not made; (2) the existence and

---

[19] Additional discovery rules protect the State. For example, Md. Rule 4-263(e) provides a list of mandatory disclosures that the defense must provide to the State without the necessity of a request by the State.

29

amount of any prejudice to the opposing party; (3) the feasibility of curing any prejudice with a continuance; and (4) any other relevant circumstances." *Raynor v. State*, 201 Md. App. 209, 228 (2011) (quoting *Thomas*, 397 Md. at 570–71).

The information allegedly omitted from the expert notice—the substance of Sergeant Crouch's findings and the grounds for his opinions—was not given to Sykes because in June 2017 Sergeant Crouch had not yet reviewed the evidence or rendered an opinion. Sykes was nonetheless aware that Sergeant Crouch was an expert in narcotics investigations and that he would eventually render an opinion based on the trial evidence as to whether the heroin seized from Sykes was for distribution or personal use. Based on this information, Sykes could generally anticipate Sergeant Crouch's testimony, and Sykes's trial counsel stated as much during the hearing on the motion *in limine*.

On appeal, Sykes has failed to explain how the expert notice prejudiced his defense. At most, Sykes suggests that he could have called his own expert to contest the methods by which police officers extrapolate intent. If, as Sykes believes, the State was required to disclose more information about Sergeant Crouch's training, he could have filed a motion to compel under Maryland Rule 2-432(B).[20] He did not do so. Nor did he request a continuance for the purported discovery violation. We discern no abuse of discretion in the court's decision to allow Sergeant Crouch to testify.

> **JUDGMENTS OF THE CIRCUIT COURT FOR TALBOT COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[20] We are not suggesting that the trial court would or should have taken an action other than that which it did. Nonetheless, a motion to compel would have permitted the trial court to cure discovery defects, if any existed, prior to trial.